PHOENIX POWDER MANUFACTURING COM-
PANY, Appellant, v. THE WABASH RAIL-
ROAD COMPANY, Respondent.

St. Louis Court of Appeals, April 28, 1903.

1. **Carrier, Shipment of Explosives: CONTRACT LIMITING LIA-
BILITY: NEGLIGENCE.** Admitted that the carrier of a carload
of explosives was only liable for its destruction by fire through neg-
ligence, yet it was a question for the jury, whether it was not negli-
gence to let it stand for several days unguarded on a transfer
track, half a mile from the business part of town, exposed to the
risk of fires built by tramps, and sparks from passing locomotives,
the car as to its contents being placarded.

2. ———: ———: **NATURE OF THIS CONTRACT.** A special ex-
ception against a common carrier's liability as an insurer of
freight, can be created only by a special agreement between the
shipper and the carrier, understandingly made, for an adequate
consideration.

3. ———: ———: **NO CONSIDERATION FOR LIMITING CAR-
RIER'S LIABILITY.** The clause in a bill of lading limiting the
carrier's liability will not be held valid on the ground that a re-
duced rate was intended, no rate being specified, and none being
talked of by the parties.

4. ———: ———: ———. The plaintiff had the right to hold de-
fendant as an insurer, or release it for a consideration, but as
there was a complete failure of proof that any consideration was
agreed upon to release defendant against loss by fire, plaintiff had
a right to treat such restrictive clause as a nullity, and no defense
against a recovery.

5. ———: **CONSIDERATION NOT WAIVED.** A shipper, by suing on
a contract evidenced by a bill of lading, does not admit that the pro-
vision therein limiting the carrier's liability is valid, and sup-
ported by consideration.

Appeal from St. Louis City Circuit Court.—*Hon. H. D.
Wood*, Judge.

REVERSED AND REMANDED.

STATEMENT.

This action was instituted by the plaintiff corporation to recover the value of some blasting material, consisting of powder, dynamite and fuse, received by the defendant railroad company at the city of St. Louis, March 30, 1901, for transportation to Twist Junction, Texas, there to be delivered to the consignee, the Stubbs Contracting Company.

The petition alleges the delivery of the articles to the defendant and the latter's agreement to safely carry them from St. Louis to Twist Junction and turn them over to the consignee in as good condition as when received; that in violation of its agreement and in disregard of its duty as a common carrier, the defendant failed and neglected to deliver the property at its destination, or anywhere else, to the Stubbs Contracting Company, and that it has been wholly lost to the plaintiff; that its value was $1,548.97, for which an ineffectual demand was made of the defendant, June 8, 1901.

The answer opens with a general denial of the allegations of the petition, and then pleads a special contract limiting the defendant's common-law liability, stipulating that neither the defendant nor any of its connecting lines should be answerable for loss or damage done to the property by fire, and containing other restrictions not important for present purposes.

These paragraphs are copied from the answer:

"For other and further answer to the petition of plaintiff, defendant says that, on or about the 30th day of March, 1901, in the city of St. Louis, Missouri, it entered into a certain written and printed special contract with the plaintiff wherein and whereby, in consideration of a certain reduced rate of freight, then and there given to the plaintiff by the defendant for the shipment hereinafter described, it undertook and agreed to transport to the end of its line only, certain property consigned and described as hereinafter set forth.

"That said special contract was in words and figures as follows, to-wit:    (Here the bill of lading was pasted in the answer, but it need not be copied at length.)

"And defendant says that other than said special contract, as hereinbefore set forth, it did not undertake or agree, at any time or place, to transport for the plaintiff or any of its agents any species of property whatever from any point to any point and that it never did, at any time or place, undertake or agree to transport any species of property whatever, from any point to any point for the plaintiff, or any of its agents, as a common carrier.

"Further answering, defendant says that for and in consideration of the reduced rate of freight given to plaintiff as aforesaid, it was expressly agreed by and in said special contract that neither the defendant, nor any of its connecting lines, should be liable to the plaintiff for any loss or damage to said property occasioned by fire not caused by the negligence of defendant or by its connecting lines. . . .

"Further answering, defendant says that for and in consideration of the reduced rate of freight given to plaintiff as aforesaid, it was expressly agreed in said special contract that said property should be transported by the defendant and its connecting lines at the risk of the plaintiff.

"Further answering, defendant says that it kept and fully performed all the terms and conditions of said special contract.    That at the time of the execution of said special contract, as now, as plaintiff well knew, the defendant's line of railway extended westwardly from the city of St. Louis, Missouri, in the direction of the State of Texas, terminating at Kansas City, Missouri.

"That defendant transported said property under said special contract as aforesaid, in due time, over its line of railway from the city of St. Louis to the end of

its line of railway as aforesaid, and there delivered the same in good order to its connecting line, the Chicago, Rock Island & Pacific Railway Company.

"That said Chicago, Rock Island and Pacific Railway Company transported said property under said special contract over its line of railway in due time from Kansas City, Missouri, to Bowie, Texas, and there delivered the same, in good order, to its connecting line, the Fort Worth & Denver City Railway Company. That while said property was in the possession of said Fort Worth & Denver City Railway Company, at Bowie, Texas, as aforesaid, it was, accidentally, and without any fault on the part of said Fort Worth and Denver City Railway Company, destroyed by fire.

"Wherefore defendant says that plaintiff ought not to have or maintain this action, and having fully answered, prays to be discharged with its costs."

A replication was filed which denied the statements of the answer and averred that when the car containing the goods in question reached the city of Bowie, Texas, it was set out on a transfer track connecting the main tracks of the Rock Island and the Fort Worth & Denver Railway Companies and allowed to stand there for several days exposed to the risk of catching fire from fires built by tramps who infested the vicinity, and from the sparks of passing locomotives. Other acts of negligence in caring for and handling the car are charged, as a consequence of which it is alleged to have caught fire and its cargo to have exploded while on said transfer track.

From the testimony adduced at the trial, it appears that part of the carload of goods had been shipped to St. Louis from Phoenixville, Illinois, over the Illinois Central Railroad, whose freight charge was paid by the defendant at St. Louis when it received the shipment. The goods were carried safely by the defendant to Kansas City, there turned over to the Chicago, Rock Island & Pacific Railroad Company, carried by it to the

city of Bowie, in Texas, and delivered to the Fort Worth & Denver City Railroad Company at that point for transportation over its route to their destination. The car reached Bowie about five o'clock in the morning of April 2d, and was placed on what is called the transfer track; that is to say, a connecting track over which goods were transferred from the line of the Rock Island Railroad Company to the line of the Ft. Worth and Denver Company, and vice versa.

There was testimony that a mistake occurred in the billing of the car, which we understand to mean there was an error in the waybill. For this reason it was not promptly transferred by the Rock Island to the Ft. Worth & Denver Company, but was delivered to and receipted for by the latter company on the third day of April. It continued to stand on the transfer track until between nine and ten o'clock in the forenoon of April 5th, and was among a string of five or six cars on that track. One of the cars next to it took fire that morning and the flames spread, with the result that the blasting material was destroyed by exploding. The transfer track was about a half-mile from the business part of Bowie and the locality was frequented by tramps who built fires in the vicinity and slept in empty box cars. Cars on the transfer track were also exposed to sparks emitted by passing locomotives, and on that track at the same time the powder car was there, was one loaded with hay, but testified to have been sealed. The powder and dynamite did not explode for nearly half an hour after the fire started and an effort was made to detach the car containing it from the one which took fire, but this could not be done.

In the receipt or bill of lading issued to the plaintiff by the defendant railroad company, certain enumerated exceptions to the ordinary liability of a common carrier were reserved in favor of the defendant and connecting lines as to the shipment in question; and as

the merits of this controversy must be ascertained chiefly from the receipt, its material terms are set out:

"BILL OF LADING.

"March 30th, 1901.

"Received from the Phoenix Powder Manufacturing Company the following packages and numbered as per margin, to be transported by the said Wabash Railroad Company, and the forwarding lines with which it connects, until the same shall have reached the point named in the margin of this contract, on the following express terms and conditions, to-wit:

"First.   The Wabash Railroad Company and forwarding lines with which it connects, and which may receive said property, shall not be liable for any damage occasioned by improper packing, or from the leakage or breakage of packages, or for any loss or damage occasioned by wet, dirt, fire or loss of weight, or for any loss, damage or delay of goods occasioned by the breaking down of bridges, or from the failure or breaking of machinery or cars, or from mob violence, strikes upon railroads, or among railroad employees, or from freshets, storms, or other providential causes.   .   .   .

"Fourth.   Consignees are to pay freight and charges upon goods, in lots or parts of lots, as they are delivered to them; but in case any goods are delivered without payment of charges, then said railroad company shall have a lien upon, and may retain all other goods of the same shipper, consignee or owner, in satisfaction of such arrearages, whether covered by this or any other bill of lading."

The rate to be charged for the carriage is nowhere stated in the receipt, nor is the subject of the defendant's compensation alluded to, except in the fourth paragraph quoted above.   The space in the printed form where the freight rate was usually inserted was, in this instance left blank, and in point of fact no rate was discussed between the parties nor agreed to before the goods were received for transportation.   The shipment

was contracted in behalf of the Wabash Railroad Company by its Mr. W. H. Wylie, commercial agent, in St. Louis, who testified as follows in regard to the rate:

"Q. Will you state your name, please, Mr. Wylie? A. W. H. Wylie.

"Q. Where do you reside? A. In St. Louis.

"Q. And what is your occupation? A. Commercial agent Wabash railroad.

"Q. Where is your office? A. 323 Chestnut street.

"Q. Mr. Wylie, are you acquainted with this shipment of the Phoenix Powder Company on March 30, 1901? A. Not prior to the shipment, no.

"Q. Well, now, Mr. Wylie, could you tell from the bill of lading and from the waybill the rate that was given upon that shipment? A. Yes, sir.

"Q. What rate was it, Mr. Wylie? A. The bill of lading don't show. The classification does — the billing does. Well, I can't tell from the tariff without seeing the billing.

"Q. What are these two bound volumes I hand you (handing witness two bound volumes)? A. These are the tariffs in effect at the time of this shipment.

"Q. Who are they published by, Mr. Wylie? A. They are published by an association. The railroads for one reason or another, possibly to save expense of printing tariffs, have an association. George W. Cale publishes them.

"Q. Do those tariffs come under the supervision of the Interstate Commerce Commission? A. Yes, sir.

"Q. Are they open to the inspection of all shippers? A. Yes, sir.

"Q. Well, now, referring to the tariff, tell me what the rate was on this shipment? A. You will find the rate in supplement No. 2 to the tariff—$1.57 per 100 pounds to Twist Junction, Texas.

"Q. Now, Mr. Wylie, you say that if the Phoenix Powder Company desired to have seen that rate they could have seen it in the published tariff? A. Yes, sir.

"Q. Now, Mr. Wylie, what rate was that—was it a low rate or was it a high one? A. Well, it was a reduced rate on powder. It was a high rate if we'd compare it with the rate on sand, or coal, or something like that.

"Q. Or rock, or anything like that? A. Yes, sir.

"Q. It was a reduced rate, though? A. Yes, sir.

"Q. Now, in case of a shipment of this nature how do you classify it on that bill of lading at that freight rate? A. At what we call first-class—at first-class rate.

"Q. At owner's risk or carrier's risk? A. First-class is the owner's risk, twenty per cent higher is the carrier's risk rate.

"Q. Now, Mr. Wylie, I'd like to ask you if the Phoenix Powder Company, or their agents, had come to you and asked you to take this shipment at your own risk, what tariff would you have charged them? A. We would have charged twenty per cent higher than $1.57.

"Q. Are those two rates on the same schedule between the same points? A. Yes, sir.

"Q. And that twenty per cent increase is provided for by the tariff and — A. Tariff and classification.

"Q. Which governed the Wabash Railroad Company at that time? A. Yes, sir.

"Q. I will ask you what that paper is which I hand you (handing witness paper)? A. Well, I got this from Kansas City. I take it for granted it is the original bill of lading—the original waybill.

"Q. The original waybill? A. Yes, sir; this is our bill from St. Louis to Kansas City on the shipment, I think. I have no doubt but what it is. I didn't make it. . . .

"Q. Now, then, the rate that you gave us here of $1.57 was the through rate from St. Louis to Twist Junction, Texas, wasn't it? A. That's the rate from St. Louis to Twist Junction, Texas.

"Q. That's what the Wabash charged on this, wasn't it? A. That's what would have been charged if it had gone through, I presume. We didn't charge all of that.

"Q. And on the bill of lading as issued in this case it means the tariff rate, doesn't it? A. Yes, sir.

"Q. In other words, in that bill of lading there is no particular rate definitely named, but down in the corner there, where the rate is to be marked and fixed, there's a cross-mark cancelling it out (showing bill of lading); that means that that bill of lading carries a through rate from St. Louis to Twist Junction, doesn't it, as published in the tariff of the Southwestern Association? A. It means the tariff rate, whether it was handled at owner's risk or carrier's risk. Now this don't say; as I understand it, the shipment was billed at owner's risk.

"Q. I'm not talking about the risk. What I want to get at is the character of the rate. That calls for a through rate then? A. This don't say what rate would apply.

"Q. Well, I understand. I say when you mark it out that way it means the through rate, doesn't it? A. It means the tariff rate.

"Q. All the way through? A. Yes, sir.

"Q. Now there is nothing in that bill of lading about owner's risk or carrier's risk, is there? A. Nothing there except these notes up here 'Subject to fire' and so on.

"Q. Yes, those are special provisions? A. Yes, sir.

"Q. *But as far as fixing the rate* on this idea that you spoke of awhile ago at owner's risk, there is nothing in that bill of lading to show which it is? A. *I thought it was in here, but it isn't.*"

At the conclusion of the evidence the trial court ruled that the defendant was answerable for the loss of the goods if it was attributable to the negligence of either of the connecting carriers; but held, also, that

there was no proof that it occurred from negligence, thus forcing the plaintiff to a nonsuit and to this appeal.

*Kinealy & Kinealy* for appellant.

(1) The defendant is liable as a common carrier for the loss of the goods in question, since plaintiff did not ask or contract for any reduced rate of freight, and there is consequently no consideration for any alleged contract limiting defendant's liability. Such a contract must be an express agreement consented to by the shipper and supported by an independent consideration. It was error, therefore, to give defendant's instruction. Levering v. Union T. & I. Co., 42 Mo. 88; Kellerman v. Railway, 68 Mo. App. 255. (2) Even if there had been a consideration for the stipulations of the bill of lading, the latter provided for through shipment. McCann v. Eddy, 133 Mo. 59; Jones v. Railway, 89 Mo. App. 753; Pophan v. Barnard, 77 Mo. App. 619; Leonard v. Railway, 54 Mo. App. 293; Hutchinson on Carriers, sec. 291a; Cash v. Railroad, 81 Mo. 109; Russell Mfg. Co. v. Steamboat Co., 50 N. Y. 121; Deming v. Cotton Press Co., 90 Tenn. 306. (3) The plaintiff was entitled to all the inferences that might be fairly drawn from the evidence, and the jury were the ones to determine whether or not the alleged negligence was established by the evidence. Consequently the court erred in giving the instruction that plaintiff could not recover. Holland v. Railroad, 13 Mo. App. 585; Biard v. Railway, 146 Mo. 265; Duerst v. Stamping Co., 163 Mo. 607. (4) If there were any doubts about the meaning of the bill of lading in that respect, the doubt would have to be resolved against the carrier and its acts under the bill would be competent evidence of the construction put upon it. Standard M. Co. v. Transit Co., 122 Mo. 272; Williams v. Railway, 153 Mo. 534; Ellis v. Harrison, 104 Mo. 270; Richardson v. Railway, 62 Mo. App. 1. (5) Being a through shipment, the defendant would be liable for the negligence of a connecting carrier. R. S. 1899, sec. 5222. (6) The evi-

dence showed negligence on the part of the connecting carrier. McMahon v. Express Co., 132 Mo. 641; Levering v. Union, etc. Co., 42 Mo. 88; Wolff v. Express Co., 43 Mo. 421.

*Geo. S. Grover* and *Henry W. Blodgett* for respondent.

(1) If a shipper receives a bill of lading at the time the shipment is made, and does not object to its terms either then or at any time before it is too late to reclaim the property, in the absence of fraud or mistake, he is bound by it. O'Bryan v. Kinney, 74 Mo. 125; McFadden v. Railroad, 92 Mo. 343; Railroad v. Cleary, 77 Mo. 634; Kellerman v. Railroad, 136 Mo. 177. (2) The common law liability of a common carrier for the safe carriage of goods may be limited and qualified by special contract with the owner, provided such special contract is supported by a consideration and does not attempt to cover losses by negligence or misconduct. Thus, where a contract was in the form of a bill of lading containing a clause exempting carrier from liability for losses by fire, the exemption is sufficient to protect the carrier, the fire not having been occasioned by any want of due care on its part. York Company v. Railroad, 69 U. S. (Wallace) 107; Vaughn v. Wabash, 78 Mo. App. 639. (3) The consideration need not be expressed. Bartlett v. Matson. 1 Mo. App. 151. (4) Every shipper must be presumed to know the existence of the schedules for interstate rates fixed by the Interstate Commerce Commission, and whether the rates charged were the regular tariff rates or not. Wyrick v. Railroad, 74 Mo. App. 406.

GOODE, J.—We think the learned circuit judge erred as regards the tendency of the evidence to prove the property in suit was destroyed as the result of the negligence of the connecting railway companies. To our minds there was plenty of evidence to warrant the inference that it was carelessness of a gross character to

leave a car of explosives on the transfer track at Bowie during three or four days, and no reason was given why it was left there so long, instead of being promptly forwarded to its destination. The highly combustible nature of the property in the car was announced by a placard on the outside, and whether the risk of loss by fire was so apparent as to warn railway employees in charge of the car against letting it stand several days unguarded on the transfer track, was a question on which the plaintiff was entitled to the jury's decision.

But we are of the opinion that the defendant's responsibility for the loss of the property is fixed by its ordinary obligation as a common carrier and does not depend on proof of negligence. The contract between the parties was for a through shipment, as is conceded, and therefore the defendant's responsibility in whatever degree it existed, continued until the goods arrived at destination, and there is no contention to the contrary. McCann v. Eddy, 133 Mo. 59.

The defendant takes its stand on the clause of the receipt or contract of affreightment exempting it from liability for the destruction of the property by fire, as constituting a complete defense to the plaintiff's action; and this position is invulnerable if the evidence shows the exemption was allowed by the plaintiff in a valid and binding manner. Such an exception to a common carrier's liability as an insurer of freight, can be created only by a special agreement between the shipper and the carrier for an adequate consideration. Levering v. Union Trans. Co., 42 Mo. 88; McFadden v. Railroad, 92 Mo. 343; Kellerman v. Railroad, 136 Mo. 177, 68 Mo. App. 255; Richardson v. Railroad, 149 Mo. 311; Conover v. Express Co., 40 Mo. App. 31; Rogan v. Railroad, 57 Mo. App. 550; Vaughn v. Railroad, 78 Mo. App. 639. As the shipper is always entitled to the benefit of the extraordinary responsibility imposed on common carriers by the law in order to adequately safeguard the public, the carrier is held to that measure of responsi-

bility, if litigation arises over property lost in transit, unless it can show affirmatively that the shipper released it from part of its liability for a satisfactory consideration; and the agreement to release must appear to have been fairly and understandingly made.

In Levering v. Transportation Company, supra, it was said:

"It is the imperative duty of a common carrier to receive whatsoever goods are offered to him for transportation in the usual course of his employment, and he takes them with all the responsibilities attached by law to his calling or employment. He can not vary his liability by inserting conditions in his acceptance of goods; but to have this effect of exonerating him, there must be a special contract assented to by the shipper."

That to relieve the carrier of a portion of his duty requires intelligent action by the shipper, appears, too, from the opinion in McFadden v. Railroad Company, supra:

"It has been held in this, and most of the States, that, by special or express contract or special acceptance, fairly and understandingly made, the carrier may limit his common-law liability. The shipper may, lawfully, if he sees fit, surrender the obligation of the carrier as an insurer of his property."

The same doctrine is expressed or implied in all the cases cited above and is prevalent in all common-law jurisdictions. New Jersey, etc., Co. v. Bank, 6 How. (U. S.) 344; 4 Elliot, Railroads, sec. 1504, and citations.

An essential ingredient of an agreement by the shipper to forego so valuable an indemnity against loss as a carrier's extraordinary liability is, of course, a consideration; and the usual or, perhaps, invariable consideration for such contracts, is an undertaking to transport the freight for a smaller charge than is otherwise exacted. The defendant says that was the consideration for the exemption relied on in this case and that it was assented to by the plaintiff in the contract of car-

'riage; but in our judgment, the evidence does not bear out the defendant's contention. All the evidence relating to the freight rate to be charged by the defendant has been stated, and it proves that no rate was named in the bill of lading or agreed to verbally. In fact the rate was not mentioned by either party and there is nothing to show the plaintiff knew it was to receive a reduced one; no testimony even that it was in the habit of shipping over the defendant's line and could have thereby learned its charge varied, accordingly as the goods were received at its own or the shipper's risk. While defendant's counsel admit the rate was neither fixed nor alluded to in the contract of affreightment, nor verbally mentioned, they endeavor to fasten constructive knowledge of what it was on the plaintiff by a series of presumptions. Their argument runs in this wise: The contract showed on its face a limitation of defendant's liability, which the plaintiff is presumed to have known; in consideration of this limitation a smaller freight charge was always made in accordance with a tariff of rates which had been fixed by an association of railway companies, vised by the Interstate Commerce Commission and published in a book open to the inspection of shippers; plaintiff is presumed to have known the different rates for freight of different classes when carried at the railway company's or the shipper's risk, because the Interstate Commerce Commission had approved them.

All this is far-fetched, and to our minds still other presumptions are required to carry knowledge to the plaintiff of the rate charged by the defendant for the shipment in controversy. Plaintiff must be presumed to have known the goods were first-class freight according to the defendant's classification for interstate business, and presumed also to have known the defendant would charge the tariff rate for first-class freight carried at the owner's risk and no more; would observe its schedule. We grant that plaintiff is presumed to have

known the contents of the bill of lading and is bound by them, there being no evidence of deception. Railroad v. Cleary, 77 Mo. 634; McFadden v. Railroad, and Kellerman v. Railroad, supra. We grant also that it has been decided a shipper is presumed to know the rates fixed and approved by the Interstate Commerce Commission and whether a rate named in a bill of lading, or agreed to verbally, is higher or lower than one published pursuant to the Interstate Commerce Act. Gerber v. Railroad, 63 Mo. App. 145; Wyrick v. Railroad, 74 Mo. App. 406. And if a bill of lading, without naming the rate, recites that it was a reduced one, proof may be made that that rate was less than the one charged for non-release contracts. Duvenick v. Railroad, 57 Mo. App. 550.

But that when no rate is fixed verbally or in writing, and no allusion is made to a reduced rate, the shipper is presumed to have known a reduced one was charged because the printed receipt contained a clause limiting the carrier's liability, has never been decided in this State, nor elsewhere to our knowledge. The argument for the defendant comes to this: It issued a bill of lading which was partly invalid unless it agreed to carry the shipment for less than was usually charged, and as it could lawfully issue only valid bills, the plaintiff must have known it did so agree, though the subject was never mentioned. The agent who gave the receipt was unable, while on the witness stand, to tell what the rate was except by comparing the waybill (with which the plaintiff had nothing to do) with the published tariff. The waybill contained a notation that the shipment was at the owner's risk and the tariff showed the ordinary rate in such instances. This circumstance suggests that the restrictive clause in the printed receipt does not of itself denote, even to the minds of the defendant's agents, what freight rate is charged for a shipment.

The plaintiff had an option to hold the defendant as an insurer or to release it for a consideration. As there was no rate agreed to, or collected, or even de-

manded from the plaintiff, the restrictive clause in the contract was a nullity and plaintiff was entitled to treat it as such. If a verbal consideration had been arranged the fact could have been shown, for the consideration of a contract may be proven by parol. Greer v. Nutt, 54 Mo. App. 4. But the evidence not only fails to prove a consideration was agreed to, but proves positively it was not. Hence, an essential element of any effective contract to release the defendant from its extraordinary responsibility is lacking and the alleged contract fails.

Certain decisions hold that in the absence of evidence to the contrary, it will be taken that the contract was in consideration of a reduced rate. York Co. v. Railroad, 3 Wall. 107; Belger v. Dinsmore, 51 N. Y. 166; McMillan v. Railroad, 16 Mich. 79; Sheague v. Railroad, 34 Kas. 347; St. Louis, etc., Railway v. Lesser, 46 Ark. 236. In all those cases we believe, the facts showed or suggested a reduced rate. It was either named and could be seen to be less than published schedules, or was stated to be reduced; and that is unquestionably true of all the Missouri cases in which such contracts were upheld.

But it has been settled by adjudications that in this State no prima facie presumption of a consideration to support a limited contract for carriage prevails. This point was directly raised and decided in Kellerman v. Railroad, supra. The opinion says:

"How, then, can it be said that the minds of the contracting parties met and without which there could be no contract in that regard. How could both parties have assented to the same term at the same time when that term was known to one of them and unknown to the other? How could the plaintiff be held to assent to a special or other rate which was unknown to him and not even specified in the contract? In such case it was a mental impossibility for the minds of the contracting parties to have met on the same subject-matter. The consideration, upon which the alleged special agree-

ment was based, was an essential element that was absent, and therefore such agreement can not be upheld. Lawson on Contracts, sec. 6; Robison v. Estes, 51 Mo. App. 582. It has been ruled in this State that a special contract exonerating a carrier from liability for negligence, must be assented to by the shipper in order to be binding on him. Levering v. Union Trans. Co., 42 Mo. 88. . . .

"In some jurisdictions it is held that where there is shown an agreement to limit the liability of the carrier, it will be presumed in the absence of proof to the contrary that it was in consideration of a reduced compensation for the carriage; but in this State the rule is, a contract must be founded on a special agreement, to which the shipper assented, for a lower rate of freight than would be charged but for such special contract. Rogan v. Railroad, 51 Mo. App. 665; Conover v. Express Co., 40 Mo. App. 31."

That case went to the Supreme Court on the dissent of one of the judges of the Kansas City Court of Appeals, and the Supreme Court likewise affirmed the judgment.

If there was prima facie a presumption of a consideration it would be overthrown in this case by the evidence; which shows no rate high or low was stipulated, but merely that the defendant intended to charge a low one.

Another point made by the respondent is that inasmuch as the appellant company sued on the contract evidenced by the bill of lading, it practically admitted said bill was a valid contract and supported by a valid consideration and can not now be heard to assert the contrary. The contract is valid except as to its restrictive clauses and affords a basis for this action.

The result of the foregoing discussion is that the only matter to be investigated in this cause is the damage sustained by the plaintiff.

The judgment is reversed and the cause remanded. *Bland, P. J.,* and *Reyburn, J.,* concur.