## BY THE

## ST. LOUIS AND THE KANSAS CITY

# COURTS OF APPEALS

63 145
74 418
63 145
101 456

---

### OCTOBER TERM, 1895

---

CHARLES GERBER, Respondent, v. THE WABASH RAIL-
ROAD COMPANY, Appellant.

St. Louis Court of Appeals, October 29, 1895.

Carriers: EFFECT OF CONTRACT FOR RATE OF FREIGHT IN CONTRAVEN-
TION OF INTERSTATE COMMERCE LAW. When a contract is made for an
interstate shipment, the shipper must be held to have contracted
with reference to and in accordance with the rates fixed by the
schedules provided for by the interstate commerce law, regardless of
the terms of the contract. Accordingly, the schedule rate of freight
is payable on the shipment, though the carrier has by mistake given
a lower rate.

*Appeal from the St. Louis City Circuit Court.*—HON.
DANIEL DILLON, Judge.

REVERSED AND REMANDED (*with directions*).

*F. W. Lehmann* and *Geo. S. Grover* for appellant.

*James E. Hereford* for respondent.

BIGGS, J.—The Southern Pacific Railway Com-
pany owns and operates a railroad from Santa Paula,

California, to Ogden, Utah. By a traffic arrangement with connecting carriers, it named and guaranteed through rates of freight to the city of St. Louis, Missouri, but was only to be held responsible for such shipments to the end of its own line. In compliance with what is known as the "Interstate Commerce Law," it printed and posted schedules of through freight rates, which showed that the minimum weight of a car load of oranges *not on ice* was twenty thousand pounds, and *on ice* twenty-four thousand pounds, and that the freight rate on such shipments from Santa Paula to St. Louis was $1.25 per hundred pounds.

On the thirteenth day of May, 1894, Porter Brothers Company delivered to the railroad company, at Santa Paula, a car load of oranges for shipment to St. Louis. The goods were consigned to the plaintiff. The shipment was *on ice*, and the agent at Santa Paula not being advised of this, or not having in mind the difference in the two kinds of shipments, by mistake inserted in the bill of lading the actual weight of the oranges, to wit, twenty-one thousand pounds, making the freight $262.50. Before the goods arrived at Ogden the company ascertained the mistake and corrected the way-bill, so as to show that the oranges were "*on ice*," and that the freight charge was $300, instead of $262.50. The defendant received the goods from an intermediate carrier and completed the shipment. The way-bill showed the mistake, and the defendant demanded of the plaintiff the correct amount of freight, which he refused to pay. Upon tender of the amount of freight named in the original bill of lading and the refusal of the defendant to surrender the goods, this action of replevin was begun. The property was delivered to the plaintiff. Under the above facts, all of which were admitted, the circuit court, sitting as a jury, rendered a judgment for the plaintiff. The defendant has

appealed, and complains that, under the agreed facts, it had a special interest in the shipment of the value of $300, which the circuit court should have protected and enforced by proper judgment or decree.

The sole question is whether the courts will, under any circumstances, enforce contracts of interstate shipments which are in violation of the provisions of the interstate commerce act? By that act it is made unlawful for a common carrier to issue bills of lading at, or receive or demand a rate of freight variant from, the rates or terms for such shipments as shown by the schedules which are required to be posted and also filed with the interstate commerce commission; and if such an offense is committed knowingly, the offender subjects himself to severe penalties. And the act further provides that, if any person by connivance, with the carrier knowingly secures transportation at less than the regular rates, he is likewise subject to the penalties of the act. Now, in the case at bar, it is conceded that the original bill of lading was not issued in accordance with the terms and conditions of the published schedules, but it is argued in support of the judgment that the schedules are no part of the law, and that, as it is conceded that neither Porter Brothers nor the plaintiff had personal knowledge of their contents, the contract, although illegal, will be enforced. This is upon the principle, which courts sometimes apply, that, unless the parties were *in pari delicto* as well as *particeps criminis*, an illegal contract will be enforced where its enforcement is necessary for the protection of the more innocent party. This rule, however, can only be invoked under circumstances which show that a wise public policy would be advanced by allowing the more innocent party to succeed. Considering the evils which the interstate commerce law was intended to remedy, would it, under any circumstances, be good policy to

allow contracts made in violation of it to be enforced specifically? We think not. Prior to its enactment, the complaint was almost universal that the common carriers were discriminating in their rates in favor of favored shippers. To remedy this evil as to interstate shipments, congress enacted the law; and it should be construed and enforced so as not in the least to thwart its purpose. Strictly speaking, the published schedules are not a part of the law itself, but are the results of the acts of the carrier and the interstate commerce commissioners in execution of the law. But every shipper must be presumed to know of the existence of the schedules and that they are open for his inspection, and also of the terms of the act rendering invalid every contract of affreightment not made in accordance therewith. Therefore, where a contract for an interstate shipment has been made and is sued on, or property rights are made dependent thereon, the shipper must be held to have contracted with reference to and in accordance with the rates fixed by the schedules, regardless of the terms of his contract. In other words, the rates of interstate shipments are not the subject of contract, but are in effect fixed under the law. To hold differently would be subversive of good policy, and it would tend to nullify the law. *Railroad v. Hubbell* (Supreme Court of Kansas), 38 Pac. Rep., 266. The Supreme Court of Alabama, in *Mobile & Ohio Railway Company v. Dismukes*, 17 L. R. A. 113, decided the same question we have here, but arrived at a different conclusion. There the railway company was the initial carrier, and it contracted for a stipulated price to deliver the goods of Dismukes in a neighboring state at a point beyond its own line. The amount of freight by mistake was fixed at a much lower sum than that authorized by the published schedules. The transportation was completed by a connecting carrier, who demanded the

schedule rate, and refused to deliver the goods unless it was paid. Thereupon Dismukes sued the Mobile & Ohio Railway Company for the conversion of the property. The supreme court held that the company was liable. The reasoning of the court does not impress us as being sound.

As the plaintiff has the property and all the facts are conceded, the judgment of the circuit court will be reversed and the cause remanded, with directions to enter judgment against the plaintiff for the sum of $300, and for costs. All the judges concur.