# WABASH RAILROAD COMPANY, Appellant, v. SLOOP.

### Division One, December 22, 1906.

1. **CONTRACT OF AFFREIGHTMENT: Theory at Trial.** Where in a suit by a railroad company, for the difference between the schedule freight rate and the rate paid, the case was tried below and presented on appeal on the theory that no contract to transport the goods at a rate less than the schedule rate could be made, appellant is bound by that theory.

2. ————: **Under Charge: Right of Carrier to Recover.** Where there was evidence to support the court's finding that there was a contract to carry defendant's goods at a rate less than the schedule rate, if, under the Interstate Commerce Act and the evidence in the case, such contract can be upheld, then the carrier is not entitled to recover from the shipper the difference between the schedule rate and the rate charged and paid at the time the goods were shipped; if said contract cannot be upheld, then the carrier is entitled to recover.

3. ————: **Schedule Rates: Posting.** Under the Interstate Commerce Act the shipper is not bound by the schedule rates unless such schedules are "posted in two public and conspicuous places" in the depot where the goods are received for transportation. The company is. And a notice by the Interstate Commerce Commission to the company that a posting of a notice to the effect that the agent had the schedules and that they could be inspected upon application, is not a compliance with that act.

4. ————: **Carrier's Right to Collect Schedule Rate.** Unless the railroad company has posted its schedule of rates as the Interstate Commerce Act requires, it cannot recover from a shipper the schedule rate for carrying his goods, but is bound by the contract by which it agreed to carry his goods for a less rate.

5. ————: **Presumption Schedules Were Posted.** Where the Interstate Commerce Act is relied upon for a cause of action or for a defense, it cannot be presumed, in the absence of proof, that the railroad company did its duty and posted the schedule of rates as the law required. [Overruling, on this point, Wyrick v. Railroad, 74 Mo. App. 406.]

6. ————: **Overcharges: Counterclaim: Federal Jurisdiction.** Until the schedule of tariff rates is established and posted as

required by the Interstate Commerce Act, the carrier and shipper are free to agree upon a rate, and such contract is enforcible. If the contract calls for a rate of 16 cents per hundred pounds for an interstate shipment, and the carrier, after discovering that that rate was less than the schedule rate, exacts of the shipper a higher rate (29 cents) than the contract price (16 cents) on a part of the goods, and sues the shipper for the difference between the schedule rate (26 cents) and the 16 cents paid on the balance of the goods, the shipper may, by way of defense, set up a counterclaim for the overcharge above the contract rate, and the State court will have jurisdiction to render judgment on such counterclaim. That contract, if valid in part, is valid as a whole. And if the carrier could not recover the difference between the .contract rate of 16 cents and the schedule rate of 26 cents, neither could it defeat the shipper's counterclaim for the overcharges, for in such case the overcharges are not such as fall within the purview of the Federal statute, there being no schedule of tariffs posted, and consequently that statute cannot be invoked against the contract.

7. **APPELLATE PRACTICE: Judgment for Right Party.** Where the judgment is for the right party it will be affirmed, notwithstanding numerous errors committed by the trial court in the course of the trial.

Appeal from Scotland Circuit Court.—*Hon. E. R. McKee,* Judge.

AFFIRMED.

*George S. Grover* for appellant.

(1) Upon the undisputed facts in this case the judgment below should have been for plaintiff. Gerber v. Railroad, 63 Mo. App. 145; Wyrick v. Railroad, 74 Mo. App. 406; Ward v. Railroad, 158 Mo. 226. (2) The counter-claim contained in defendant's answer should have been stricken out on plaintiff's motion. Walker v. Lewandovska, 15 Mo. App. 581; Carlisle v. Railroad, 168 Mo. 652.

*Fogle & Saxbury* for respondent.

(1) Respondent contracted and agreed with appellant to pay it sixteen cents per hundred pounds, to

ship his timothy seed from Queen City, to Chicago, and appellant accepted and agreed to this and billed respondent's seed out at that rate, and gave respondent a bill of lading containing the contract. This contract is valid and binding, unless in violation of some law. 6 Cyc., 420, 416, 431, 433; Landees v. Railroad, 50 Mo. 346; O'Bryan v. Kinney, 74 Mo. 125; Holten v. Railroad, 61 Mo. App. 204; Gann v. Railroad, 72 Mo. App. 34. (2) Appellant cannot claim the benefit of the Interstate Commerce Act, or any of its provisions as against a shipper, until it has fully complied with the provisions of said act. This it has not done, as it admits. See act; Wyrick v. Railroad, 74 Mo. App. 406; 4 Elliott on Railroads, sec. 1686; San Berbarndino v. Railroad, 3 Interst. Com. R. 138; Kellerman v. Railroad, 136 Mo. 188; In re Rate Sheets, 1 Interst. Com. R. 316; In re Railroad, 2 Interst. Com. R. 496; Phelps v. Railroad, 4 Interst. Com. R. 363; Lehmann v. Railroad, 3 Interst. Com. R. 706; Coupland v. Railroad, 61 Conn. 531; In re filing Copies, etc., 1 Interst. Com. R. 76; In re Passenger Tariff, 2 Interst. Com. R. 445; Town of East Hartford v. Bank, 49 Conn. 539; Upton v. Triblecock, 91 U. S. 45; Cairns v. Railroad, 4 R. & Canal Traf. Cas. 221; Walkinson v. Railroad, 3 Nev. & Mac. 446; Clonmel Traders v. Railroad, 4 R. & Canal Nev. & Cas. 92; Myrick v. Railroad, 107 U. S. 108; Stewart v. Railroad, 3 Fed. 768; Railroad v. Horne, 59 S. W. 134; Railroad v. Leatherwood, 69 S. W. 119; Paddock v. Railroad, 60 Mo. App. 328; Ward v. Railroad, 158 Mo. 226. (3) But if appellant had complied with the Interstate Commerce Law in printing and posting the schedule of rates in the depot as required by said act, and then thereafter contracted with respondent to ship his seed at the rate of sixteen cents per hundred pounds to Chicago, this contract would be valid, because there is nothing in said act declaring said contract void. It is true it fixes a

punishment for the party, but it does not invalidate the contract. Paddock v. Railroad, 155 Mo. 543; Railroad v. Railroad, 149 Mo. 245; Utley v. Hill, 155 Mo. 232; City of Clinton to use v. Henry County, 115 Mo. 59; Hickman v. City of Kansas, 120 Mo. 110. (4) Respondent had to pay thirteen cents more per hundred pounds at Chicago, on the five carloads of seed, to obtain his seed and place them on the market, than he contracted to pay. This amount he can recover. 4 Elliott on Railroads, sec. 1564. (5) Remedy of the shipper against the carrier to recover damages for unreasonable and extortionate charges at common law remains until the Legislature, or Congress, sees fit to enact a statutory remedy. Winsor Coal Co. v. Railroad, 52 Fed. 716. (6) The Interstate Commerce Act, however, declares that nothing in this act contained shall in any way abridge or alter the remedies now existing at common law, or by statute, but the provisions of this act are in addition to such remedies afforded by the Federal statute; therefore, are cumulative and not exclusive. Section 22, Interstate Commerce Act.

GRAVES, J.—Plaintiff by its petition states that it is a common carrier, a railway corporation; that during the year 1902 it transported nine car-loads of timothy seed for defendant from Queen City, Missouri, to Chicago, Illinois; that in compliance with the Interstate Commerce Act of 1887 and subsequent amendments thereto, it filed with the Interstate Commerce Commission, in the city of Washington, its printed schedule or tariffs, showing the rates of freight then in force, from all points on its railway in one State to points in another State; "that said schedules or tariffs were then, as now, duly printed, published and filed by plaintiff in strict conformity to said law of the United States then in force;" that the rate on timothy seed then in force and fixed by said schedules and tariffs,

was twenty-six cents per hundred pounds from Queen City, Missouri, to Chicago, Illinois; that by mistake, plaintiff's agent billed out four car-loads of said seed at sixteen cents per hundred pounds; that said seed was delivered to defendant's consignee before said mistake was discovered; that on these four car-loads, the difference between the rate fixed in said schedules or tariffs, twenty-six cents per hundred pounds, and the rate of sixteen cents per hundred pounds, amounted to $188.58; that in the shipment of the other five cars, the agent of plaintiff, by mistake, billed them out at twenty-nine cents per hundred pounds; that the full twenty-nine cents per hundred pounds was collected before the mistake was discovered; that by reason of the over-charge of three cents per hundred pounds, the plaintiff collected $66.61 more than should have been collected; that the mistake was never discovered until after delivery to defendant's consignee; that immediately after the discovery of said errors, it demanded of the defendant the sum of $121.97, or the difference between $188.58 and $66.61, which demand defendant refused.

The action for said sum of $121.97 was then brought in the circuit court of Schuyler county, but was afterwards taken to Scotland county on change of venue, where it was tried.

The answer is first a general denial. Then for further answer, the defendant averred that by contract with plaintiff's agent, the plaintiff agreed to transport timothy seed for him from Queen City, Missouri, to Chicago, Illinois, for the price of sixteen cents per hundred pounds, and defendant agreed to pay said sum; that in pursuance of said agreement, defendant delivered to plaintiff the nine car-loads of seed; "that the plaintiff issued to the defendant bills of lading for the said nine car-loads of timothy seed at the rate of the stipulated price aforesaid, to-wit, sixteen cents per hundred pounds; that the defendant paid the plaintiff

and the plaintiff accepted sixteen cents per hundred pounds for the freight on four car-loads of said timothy seed; that thereafter plaintiff refused to accept the sixteen cents per hundred pounds for the remaining five car-loads of timothy seed as aforesaid, but demanded of the defendant twenty-nine cents per hundred pounds on five car-loads of timothy seed and wrongfully and unlawfully refused to accept the sixteen cents per hundred pounds and refused to turn over the said five car-loads of timothy seed to the defendant unless the defendant would pay twenty-nine cents per hundred pounds thereon; that the defendant was compelled to pay the plaintiff in order to obtain his said timothy seed, which payment was made under protest and was not justly due to payment, the amount of twenty-nine cents per hundred pounds which he did under protest in order to obtain his said timothy seed and place them on the market; that the amount of said five car-loads of timothy seed was 221,978 pounds and at twenty-nine cents per hundred pounds, amounted to $643.74, which sum defendant was compelled to pay as aforesaid; that the amount actually due the plaintiff on said timothy seed according to the terms of said contract was $355.-18; but the difference in said amounts is $288.56, which defendant was compelled to pay and did pay under protest to the plaintiff.    Wherefore, defendant prays judgment for the sum of $288.56, with interest and cost of suit."

Plaintiff moved to strike out all that part of the answer except the general denial, and the admission of plaintiff's corporate capacity, and the transportation of the seed.   The reasons assigned in said motion follow:

"1.   Because said part of said answer does not constitute a defense to plaintiff's action.

"2.   Because, under the Interstate Commerce Law, as set forth in plaintiff's petition, a shipper cannot sue

in a State court to recover damages from a railroad company for charging him rates in excess of those permitted by the said Interstate Commerce Act.

"3. Because a court of the United States is the only forum vested with jurisdiction to hear and determine a controversy in which a counterclaim appears, as is attempted to be set up in said lines of said answer.

"4. Because this court has no jurisdiction to hear or determine the allegations set up by defendant in said lines of said answer."

This motion was overruled, plaintiff excepting, after which a reply in the nature of general denial was filed.

From the evidence there seems to be no dispute as to the amount of seed shipped, and the amount of freight collected. Plaintiff introduced copies of the schedule and tariffs on file with the Interstate Commerce Commission, which shows the rate of twenty-six cents per hundred pounds on timothy seed. Plaintiff further showed the printing and distribution of these schedules or tariffs, and that two copies thereof had been sent to Queen City, Missouri, to be used for public reference. By witness Jennings, who was traveling freight agent for plaintiff in the territory including Queen City, it was shown, that to his best knowledge and belief, the tariff rates were with the agent at Queen City, in the railroad office, and that notice to that effect was posted up in the waiting room of the depot; that these rates could have been obtained by the shipper by calling upon the agent; that the rates themselves were not posted up in the depot, for the reason that they were being constantly torn down, and that the Interstate Commerce Commission had written his company that filing the schedules with the agent, subject to inspection by shippers, with notice of that fact posted in the depot or waiting-room, was sufficient com-

pliance with the law; that in his territory the schedule of rates themselves had not been posted up for some years, but only a notice that such schedules were there subject to inspection.

So far as the record before us shows, the following is all that appears for defendant:

"*John Sloop,* being sworn, testified:

"I reside in Queen City, Missouri, and have resided there about thirty-two years. I am the defendant in this case.

"Q.  Before you made this shipment in controversy, Mr. Sloop, what conversation did you have with the plaintiff's agent at the depot there?

"Objected to for the reason that the defendant alleges that he had a written contract for the shipment of the seed; that being the case, all previous conversations are presumed to be merged into that.

"Q.  By Mr. Higbee:  I'll ask you if you did not have a written contract, Mr. Sloop?  A.  Just had a verbal contract; did not have any writing; he gave me a bill.

"Mr. Fogle:  We have no written contracts; we have receipts.

"By the Court:  Gentlemen, a railroad agent has no authority to enter into a verbal contract.

"Mr. Fogle:  An agent has a right to make a contract within his authority.

"The Court:  Yes, he has a right to state the rates.

"Q.  Now, what was the conversation?

"Objected to as being incompetent, irrelevant and immaterial.

"Objection overruled and exceptions noted.

"A.  I went down to the depot and says to Mr. West: 'What is the rate on timothy seed to Chicago.'

That was in 1902, in the month of August. He says, 'Sixteen cents.' He is there now. Well, I went right out and commenced buying as quick as I could after finding out the rates. When I came back Mr. West got the car and the seed was loaded, and he made me out a shipping bill to Rosenbaum Bros.; I think Mr. Saxbury has that bill; I sent it to the market along with the bill of lading that I got, the freight bill.

"Q. Now, Mr. Sloop, did you have any knowledge of any schedule of rates for transportation at that time from Queen City to Chicago?

"Objected to because the law presumes he knows the rates; he knows the schedules are in existence, and that he can see these schedules upon inquiry.

"The Court: The only question there is in this case is whether or not that notice has been stuck up in the depot.

"Plaintiff notes exception.

"A. Nothing, only what the agent told me.

"Q. Was there any schedule of rates or charges for such property posted in the depot at Queen City at that time?

"The Court: The plaintiff says there was not; admits it here in their depositions.

"Mr. Fogle: Let the record show that the plaintiff admits that the schedule rates on timothy seed was not posted in the depot at Queen City at all.

"CROSS-EXAMINATION.

"I am fifty-seven and have lived in Queen City about thirty-two years, was raised right in that neighborhood, born and raised in Schuyler county; I have done business with the Wabash railroad as much as thirty-two years; I am a merchant; I own a mill, but am not a miller; I have owned a mill near the depot for about fourteen years; I do some shipping over the road; I own two or three farms and raise, buy and

ship cattle and hogs; have pursued these various businesses about thirty-two years; I very frequently ask the rates on freight; I don't know anything about the tariff rate; I asked him what the rate was; I did not inquire for any other, of course not; I shipped this grain to Rosenbaum Bros., and they paid the freight upon it; they sold for my account."

The plaintiff asked and the court refused the following instructions:

"1. The court declares the law to be, that under the pleadings and evidence in this case, the plaintiff is entitled to recover the sum here sued for, to-wit, the sum of $121.97.

"2. The court declares that under the law this court has no jurisdiction over the subject-matter of the counterclaim pleaded in defendant's answer.

"3. The court declares that under the law and the evidence, the defendant cannot recover upon the counterclaim pleaded in his answer.

"4. The court declares that the claim for damages in defendant's answer is for unliquidated damages, and is not proper subject-matter for counterclaim or setoff.

"5. If the court finds from the evidence the schedule of freight rates read in evidence by plaintiff was on file in the office of the secretary of the Interstate Commerce Commission at Washington, D. C., in February, 1902, and copies thereof were kept on file in plaintiff's depot at Queen City for inspection by the public, and a notice of that fact was kept conspicuously posted in said depot, and same was done in accordance with a ruling of the Interstate Commerce Commission, then the court declares the finding and verdict should be for plaintiff for $121.97 and against the defendant on its counterclaim."

The court then found against plaintiff and for defendant upon his counterclaim in the sum of $310.78.

Motions for new trial and in arrest of judgment being overruled, plaintiff appealed.

The points raised by appellant will be duly noted in the course of the opinion.

I. Upon the question of a contract between plaintiff and defendant to transport timothy seed from Queen City to Chicago for sixteen cents per hundred pounds, the evidence is very meager, but this question is not urged here by counsel for appellant. The case was tried below and was presented here upon the theory that no such contract could be made; by that theory appellant is bound. There is slight evidence tending to show such contract and being satisfactory to appellant both below and here, we pass it without further question.

Under the "Interstate Commerce Act" pleaded by appellant, and the evidence in this case, should such contract be upheld? If so, then plaintiff, now appellant, was not entitled to recover the amount sued for in this action, but if not, then it was entitled to recover.

Plaintiff in its petition alleges its ownership of a line of railroad from Queen City, Missouri, to Chicago, Illinois. This transaction occurred in 1902, and is, therefore, governed, if at all, by the Interstate Commerce Act, as it then existed. In paragraphs one and four of section 6, page 3156, vol. 3, U. S. Comp. Stats. 1901, published by West Publishing Company, will be found this law, in so far as applicable to the cause at hand. These paragraphs are as follows:

"That every common carrier subject to the provisions of this act shall print and keep open to public inspection schedules showing the rates and fares and charges for the transportation of passengers and property which any such common carrier has established and which are in force at the time upon its route. The schedules printed as aforesaid by any such common

carrier shall plainly state the places upon its railroad between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately the terminal charges and any rules or regulations which in any wise change, affect, or determine any part of the aggregate of such aforesaid rates and fares and charges. Such schedules shall be plainly printed in large type, and copies for the use of the public shall be posted in two public and conspicuous places, in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation in such form that they shall be accessible to the public and can be conveniently inspected. . . . And when any such common carrier shall have established and published its rates, fares, and charges in compliance with the provisions of this section, it shall be unlawful for such common carrier to charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any services in connection therewith, than is specified in such published schedule of rates, fares, and charges as may at the time be in force.''

There are other provisions of said section 6, of the Interstate Commerce Act, which apply to corporations receiving freight in the United States to be carried through a foreign country, to be delivered to any place in the United States, and still other provisions which apply to freight as well as passengers being carried over continuous lines or routes operated by more than one carrier. These are respectively paragraphs 2 and 5 of the section. Plaintiff, by its petition, being the owner of the entire line, and the line not running through a foreign country, does not fall under either of the two paragraphs just mentioned. We mention this now for the purpose of drawing a distinction later.

200 Sup.—14

From the record it appears that plaintiff, appellant, did have its schedule of rates on file with the Interstate Commerce Commission; that it had printed the same, and mailed copies thereof to its agents, including the agent at Queen City; that it had not for several years prior kept such schedules of rates posted in its depot for the reason that they were being constantly torn down, and the Interstate Commerce Commission had written the company that the posting of a notice to the effect that the agent had the schedules and they could be inspected upon application, was a sufficient compliance with the act. It might be remarked here that this letter does not appear in the record.

Does this evidence show a compliance with the law, which says: "Such schedules shall be plainly printed in large type, and copies for the use of the public shall be posted in two public and conspicuous places, in every depot, station, or office of such carrier where such passengers or freight, respectively, are received for transportation in such form that they shall be accessible to the public and can be conveniently inspected?"

We think not. Such schedules are not only required to be printed, but "shall be posted in two public and conspicuous places in every depot," etc. The law does not say that notice to the effect that the schedule of rates may be found with the agent or somewhere else, shall be posted, but the schedule of rates or rather printed copies thereof, shall be posted. This is the means provided by law for bringing home notice to the general shipping and traveling public, what the rates are, as established. There is no other way prescribed by law to bring knowledge home to the shipper or traveler, as to what the fixed and legal rates are. If the schedule of rates are posted, then the public is presumed to have knowledge of the rates, but not until then, unless actual knowledge be shown. The public

has this knowledge whether the rates are read or not, as we have knowledge of a recorded deed although we never read it. The carrier may be bound by the rates by it published and in the possession of its agent, but the shipper is not bound thereby until notice is brought home to him in the manner prescribed by law.

In our opinion the law is well reviewed by CALD-WELL, J., of the Supreme Court of Tennessee, in the case of Railroad v. Horne, 106 Tenn. 73, 59 S. W. 134. This was a case of connecting carriers and fell under paragraph 5 of the Interstate Commerce Act, but applies with equal force here, as to a carrier falling under paragraph one of said section. Paragraph one says the publicity must be given by posting the schedules. Paragraph five requires publicity in such manner as may be directed by the Interstate Commerce Commission. The method of giving notice or publicity is different in the two classes of carriers, but in each it must be given as by the law directed. Judge CALDWELL's language, which we approve, is as follows:

"Ordinarily the rate of affreightment inserted in a bill of lading is binding on the parties, and will be effectuated by the courts as agreed compensation for the services contemplated. It is the contractual standard for computing the price to be paid for the transportation and delivery of the goods; and the tender of that price by the consignee, as a general rule, entitles him to their immediate possession, and will warrant an action of replevin if they be not promptly surrendered. That rule controls the present case, unless the Federal law invoked by the company creates an exception within which it falls. Section 6 of the Interstate Commerce Act of 1887 (chap. 104, 24 Stat. 379), as amended in 1889 (chap. 382, 24 Stat. 855), requires (1) that every common carrier engaged in interstate transportation shall furnish the Interstate Commerce Commission a copy of its schedule of rates, and thereafter

print and publicly post it at each station upon its line; (2) that all connecting carriers engaged in interstate transportation on joint schedules of rates shall in like manner file a copy thereof with that commission and thereafter make the same public when, where, and in such manner as the commission may from time to time require; (3) that the rates, when so established, shall not be changed except upon prescribed notice. The tenth section of the act imposes a large penalty for a violation of any of these provisions. This legislation, having been passed by the Federal Congress with a view of regulating interstate commerce, undoubtedly supersedes and abrogates all conflicting State statutes and general laws. [Railroad v. Hefley, 158 U. S. 99, 15 Sup. Ct. Rep. 802, 39 L. Ed. 910; Railroad v. Harrison (Ala.), 24 So. 552.] And, if applicable in this case, it is obviously controlling in the defendant's favor. Is it applicable under the facts disclosed in this record? Manifestly, the act is not self-executing as to the public. It imposes no obligations or restraints upon the public, and in no way affects it, until after certain preliminary steps have been taken by the carrier or carriers. Shippers are not affected by the act until the required publication of rates has been made, and, to bring them within its operation in a given case, the burden is upon the carrier or carriers to show compliance with that condition precedent. If the contest be with respect to a shipment over a single line, the carrier, to have the benefit of the act, against its patron, must show publication at each of its stations; and, if it be as to a transportation over connecting lines on joint account, they must show that they have made such publication as the commission directed, or the act will not be applied in their favor. It was the latter burden that rested upon the defendant in this case, the transportation here involved having been made by connecting carriers jointly. The record con-

tains no evidence of any publication at any time or place of the alternate rate on which the defendant relied in the court below; nor, indeed, does it contain any evidence that the commission ever directed that the same should be published at all.  The latter omission might with plausibility be urged as an excuse for the former one; that is, the failure on the part of the plaintiff to prove that the commission directed a publication of this rate with some reason might be said to have relieved the defendant of the necessity of proving that publication had been made, if both facts were equally dependent upon affirmative proof for their establishment.  Such is not true, however.  The publication required by the act is intended for the inspection, information, and advantage of the public.  [Railroad v. Hefley, 158 U. S. 101, 15 Sup. Ct. Rep. 802, 39 L. Ed. 910.]  And it is certainly contemplated that some publication shall be made in every instance, though the character and extent of publicity to be given by connecting carriers are left to the discretion and direction of the commission.  The courts will presume—at least, in the absence of proof to the contrary—that the commission in the discharge of its duty, according to the manifest spirit and clear implication of the act, directed some kind of publication to be made by these carriers when it set the seal of its approval upon their schedule of rates.  This record affords no evidence that such direction was not given.  Hence, the presumption that it was given is conclusive for the purposes of this litigation, and the defense of the company must fail because it did not prove compliance with that direction.  This court cannot say, as did the learned trial judge, that the alternate rate urged by the company should have been published 'at the initial point of shipment;' for, in the absence of the direction presumed to have been given, it cannot be known that publication at some other point or points in the route was not deemed sufficient, and directed by the commission.  Some publi-

cation is presumed to have been directed, but none is shown to have been made. This excludes the case from the operation of the Federal statute, but leaves the plaintiff with his rights under the bill of lading unimpairable and enforceable in this suit.''

To the same effect is the holding of the Texas Court of Appeals, where the Interstate Commerce Act was invoked. In Railroad v. Leatherwood, 69 S. W. l. c. 121, TEMPLETON, J., says: ''Appellees had no notice of the alleged rate. Until the tariff was established and published as required by law, it was not binding on the public, and a contract for a different rate would be valid and enforcible. [Railroad v. Horne (Tenn.), 59 S. W. 134.] Unless the tariff rate charged had been established and published in such manner as to make it binding, the stipulation in the contracts made by appellees with the Texas & Pacific Company to pay 'at the rate of tariff' would not render them liable to pay more than the rate agreed on. The written contracts executed by appellees cannot be construed to bind them to pay a tariff which had not been legally established.''

We conclude, therefore, that under the evidence in this case, the Interstate Commerce Act pleaded afforded no rights to plaintiff for the reason that it had not brought itself within the purview thereof by posting its schedules of rates as required by that law.

By appellant we are cited to the cases of Gerber v. Railroad, 63 Mo. App. 145; Wyrick v. Railroad, 74 Mo. App. 406; and Ward v. Railroad, 158 Mo. 226. These cases, excepting the Wyrick case, are not out of line with the conclusion we have reached. In the Gerber case, supra, it is said, page 146: ''In compliance with what is known as the 'Interstate Commerce Law,' it printed and posted schedules of through freight rates,'' etc. So that this opinion of BIGGS, J., in no wise controls the case at bar. The facts are different.

In the Wyrick case, supra, SMITH, P. J., it is true, says that there was no evidence of the filing of the schedule of the rates with the Interstate Commerce Commission, nor of the publication thereof by defendant. He adds that in the absence of proof to the contrary, the Interstate Commerce Commission and the railroad company will be presumed to have performed their duty. To this we do not assent, where the law is relied upon for a cause of action or a defense. The law requires certain conditions precedent, and it devolves upon the party invoking the law to show that it had done and performed the conditions precedent. To this extent this opinion does not properly declare the law and should be overruled. Again, this opinion, page 418, says: "Every shipper must be presumed to know the existence of the schedules and that they are open for inspection. [Gerber v. Railroad, 63 Mo. App. 145.] The plaintiff knew, or by the exercise of ordinary prudence could have known, the regular tariff rate which defendant was allowed to charge on his proposed interstate shipment."

It will be observed the Gerber case is cited, in which the posting of the schedules is conceded. If the reading of the Wyrick opinion is that the shipper is presumed to know the schedule rates without the posting or other publicity required by the Interstate Commerce Act, then it is wrong and should no longer be followed. But the real question in the Wyrick case was that the shipper had signed a written contract in which it was recited that the company had two rates upon live stock, and that the rate given was a special rate, "and understood to be less than the published tariff rate." That by reason of having signed this contract, without fraud, deceit, imposition or mistake, he was bound by the statements therein and that these recitals were *prima facie* evidence and established the fact of a reduced rate as consideration for the con-

tract. So that this case was really disposed of before the learned judge reached the Interstate Commerce Act and his remarks thereon.

In the Ward case, supra, ROBINSON, J., says that the evidence showed that the rate fixed in the contract was the schedule rate. There is not a word said as to whether the schedule had been posted or not, but it had evidently been printed, so that there is really nothing in this opinion which militates against our views in the case at bar.

We are further cited to Railroad v. Harrison, 119 Ala. 539, and Railroad v. Hefley, 158 U. S. 98, and one or two other cases, but they are not in point. The Hefley case is strongly favorable to our contention. In that case, at page 101, Justice BREWER says: "By section 6 every common carrier, subject to the provisions of the act (and all railroads carrying interstate freight are subject to its provisions), is, for the inspection and information of the public, required to print and *publicly post* at each station upon its route the schedules of fares and rates for carriage of passengers and property thereon."

In the Harrison case, 119 Ala. 1. c. 540, the statement of the case reveals: "That the rate in question was less than the proper rate contained in the schedule of rates which had been duly approved by the Interstate Commerce Commission, as required by the act, and *duly published* and *posted* as required thereby in defendant's stations in Atlanta and Birmingham." It also appears that the carrier in this case was permitted to recover for the very thing sued for in this case, but upon a state of facts entirely different—a state of facts which showed absolute compliance with the Federal law.

A careful examination of all the cases but strengthens the view that the failure of the record in the case at bar to show a compliance with the law precludes

plaintiff from the benefits thereof as a basis of a cause of action and, we will add, as a basis of defense to defendant's counterclaim.

It therefore follows that the judgment against the plaintiff appellant, on the $121.97 was correct notwithstanding other complaints as to the rulings of the trial court.

II.  We next come to the question of the counterclaim set up in the defendant's answer and upon which he procured judgment.  This counter-claim proceeds upon the theory that there was a contract with plaintiff to transport defendant's timothy at sixteen cents per hundred pounds.  If there was a contract at all, it covered the nine cars.  Plaintiff admits that as to the five cars there was an overcharge of three cents per hundred pounds, the difference between its alleged schedule rate and the price actually received, and credits the account sued upon with such amount.  Again, plaintiff, the appellant, does not urge that the contract out of which this counter-claim grew was not sufficiently shown, but contends that a State court was not the forum for hearing such a claim; that overcharges can only be collected by action before the Interstate Commerce Commission or in the proper Federal court, as provided in section 9 of the Interstate Commerce Act.  It is true, as to the overcharges, within the purview of the Interstate Commerce Act, our court in Carlisle v. Railroad, 168 Mo. 652, has so said.  In that case the court held that the Federal law was not involved in the case and for that reason certified the case to the Kansas City Court of Appeals.  It would thus appear that what was said by Robinson, J., as to the forum for a trial of a case of overcharges, was largely unnecessary for the judgment reached and therefore *obiter dicta*, yet be it what it may be in this regard it is good law and would be applicable to the case at bar, if the overcharges, here, were within the meaning of

the Interstate Commerce Act. For such overcharges, the Federal statute which gives the right of action likewise gives the remedy and the forum. So that we concur in what was said by Judge ROBINSON in the Carlisle case. But is this a case wherein there are overcharges within the meaning of the Federal statutes? What we have said as to defendant's contract and its validity under the law lends much light here. Had the proper steps been taken by the plaintiff to bring itself within the protection of the Federal statute there could have been no valid contract with defendant of the character by him pleaded. But this failure, as we see under the authorities in the first point cited, left defendant the right to make such contract and made such contract valid. If valid in part, it must, by the nature of things, under this state of facts, be valid as a whole. If valid so as to defeat plaintiff's right of recovery of the difference between sixteen cents, the contract price, and twenty-six cents, the alleged schedule price, then it is valid to the extent of permitting the defendant to recover back that sum in excess of the contract price already collected by defendant. Again, appellant here raises no point that this excess was voluntarily paid, but proceeds upon the theory that although voluntarily paid, or involuntarily paid, the overcharge must be collected through a Federal tribunal. Such was the contention below and such it is here. Barring the question as to the quantum of evidence, both upon the question of the contract and on this counter-claim, which at least could be made stronger, we will pass upon the question urged and seemingly acted upon by both parties.

This counter-claim grows out of the same contract of shipment and falls strictly within our statutory provisions as to counter-claims, and, as above said, if the contract is so far valid as to defeat plaintiff the same contract is sufficient to sustain the counterclaim.

If plaintiff could invoke the Federal statute under our holding in the Ward case, supra, he could recover, but on the other hand if the overcharges are not such as fall within the Federal statute, then it cannot be invoked to divest the State court of jurisdiction. Overcharges falling within the jurisdiction of the Federal tribunals mentioned in section 9 of the Interstate Commerce Act, are overcharges growing out of an excess of rates over and above the rates fixed by schedules filed, published and posted as required by the Federal act.

We therefore conclude that the defendant could properly maintain his counter-claim in the State court and in this action.

The foregoing, while not *in seriatim*, answers all of the contentions of the appellant. This likewise gives the appellant the benefit of all the evidence offered and excluded by the court. It follows that, while not without numerous errors upon the part of the trial court, in the course of the trial, the judgment is for the right party and is affirmed.

All concur.