A. B. HUNTER, Respondent, v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellant.

St. Louis Court of Appeals, October 8, 1912.

1. COMMON CARRIERS: Action for Overcharge: Prima Facie Case: Interstate Commerce. In an action against a common carrier for exacting, at destination, a higher rate of affreightment for carrying an interstate shipment than was contracted for at the point of shipment, plaintiff makes a prima facie case by proving the rate contracted for and that such rate was inserted in the bill of lading, and that defendant had exacted at destination, and plaintiff had paid under protest, the amount sued for in excess of that rate.

2. ————: ————: ————: Evidence. Ordinarily, the rate of affreightment inserted in a bill of lading is binding on the parties and will be effectuated by the courts as agreed compensation for the services contemplated.

3. ————: ————: Defenses: Interstate Commerce: Burden of Proof. Although the parties to an interstate transportation contract cannot, by agreement, mistake or otherwise, fix a rate of affreightment different from that established under the Interstate Commerce Act, nevertheless, in an action against a common carrier for exacting, at destination, a higher rate for carrying an interstate shipment than was contracted for at the point of shipment, the burden of showing that the rate exacted had been established in accordance with the requirements of said act rests on the carrier.

4. ————: ————: ————: ————: ————: Trial Practice. In an action against a common carrier for exacting, at

destination, a higher rate of affreightment for carrying an interstate shipment than was contracted for at the point 'of shipment, where defendant's station agent testified on its behalf to facts tending to prove that the rate exacted had been established in accordance with the requirements of the Interstate Commerce Act, *held* that the court properly refused to direct a verdict for defendant on the ground it was conclusively established that the rate exacted had been established in accordance with the requirements of said act and was therefore the only legal rate that could be contracted for or charged, inasmuch as the credibility of defendant's witness was for the jury.

5.  **TRIAL PRACTICE: Demurrer to Evidence: Uncontradicted Evidence.**  Although evidence offered to establish a defense preclusive of a recovery is uncontradicted, it is not proper to direct a verdict thereon, since the credibility of the witnesses giving it is for the jury.

6.  **COMMON CARRIERS: Interstate Commerce Act: Necessity of Publishing Rates.**  In order to establish rates for the carriage of freight in accordance with the requirements of the Interstate Commerce Act as it stood in 1908 (1909 Supp. Fed. Stat. Ann., pp. 260, 261), the carrier was bound to file the schedule of such rates with the Interstate Commerce Commission and to publish the same; the publication consisting in promulgating and distributing the schedule, by furnishing it in printed form to each freight office for which a rate was sought to be established, preparatory to putting it into effect.

7.  ———: ———: ———.  Under the Interstate Commerce Act as it stood in 1908 (1909 Supp. Fed. Stat. Ann., pp. 260, 261), providing that a carrier, in order to establish interstate rates, must file a printed schedule thereof with the Interstate Commerce Commission and must publish the same, a carrier, to prove the establishment of an interstate rate applicable to shipments from a particular station, is bound to prove that a printed copy of the schedule containing such rate had been furnished to that station or to the agent in charge thereof; and proof that a printed copy of the schedule containing the rate had been furnished to another station, some six miles distant from the station in question, and to the agent in charge thereof, was insufficient.

8.  **RAILROADS: Common Carriers: Authority of Local Agent.**  The authority of a local agent of a railroad company extends only to the control of the company's business at his own station.

167 Mo. App.—40

Appeal from New Madrid Circuit Court.—*Hon. Henry C. Riley*, Judge.

AFFIRMED.

*W. F. Evans, Moses Whybark* and *A. P. Stewart* for appellant.

(1) Interstate freight rates are established when a schedule thereof is filed by a carrier with the Interstate Commerce Commission, and copies are furnished by the railway company to its freight offices, although such rates may not be "posted" as required by Sec. 6 of the Act to Regulate Commerce. Such rates, when regularly established, are no longer the rates imposed by the carrier, but the rates imposed by the law. Railroad v. Oil Mill, 204 U. S. 449; Grain Co. v. Railroads, 12 I. C. C. Rep. 418. (2) A common carrier may exact the regular rate for an interstate shipment, although a lower rate was quoted by the carrier to the shipper who shipped under the lower rate so quoted. Gerber v. Railway, 63 Mo. App. 145; Railroad v. Hefley, 158 U. S. 98; Railroad v. Mugg, 202 U. S. 242; Railroad v. Cotton Oil Co., 204 U. S. 426; Railroad v. Oil Mill, 204 U. S. 499; Haurigan v. Railroad, 80 Neb. 132; 16 Am. & Eng. Ann. Cas. 450; Railroad v. Hubbell, 54 Kan. 232, 5 I. C. C. Rep. 241; Railroad v. Bundick, 94 Ga. 775, 5 I. C. C. Rep. 289; Grain Co. v. Railroad, 12 I. C. C. Rep. 418; Ohio I. & M. Co. v. Railroad, 18 I. C. C. Rep. 299; Railroad v. Dumas, 43 S W. (Tex.) 609; Sutton v. Railroad, 140 S. W. 76. (3) The failure on the part of the shipper to pay, or of the carrier to collect the full freight charges, based upon the lawfully published rate for the particular movement between two given points, constitutes a breach of the law, and will subject either one or the other, and sometimes both, to its penalties. Sec. 10, Act to Regulate Commerce, as amended March 2, 1889, 25 U. S. Stat.

at Large, 855; Grain Co. v. Railroads, 12 I. C. C. Rep.
l. c. 422.

*Brown & Gallivan* for respondent.

(1) Respondent contends that the failure to post
the rate or to furnish the tariff upon inquiry was a
violation of the law and that by reason of said viola-
tion of the law he had no notice and did not know the
freight rates on corn from Lilbourn or Marston to
Birmingham, Ala. (2) That to bind a shipper the
appellant would have to have the rates in the office
where it could be inspected by the shipper upon ap-
plication to the agent. And that, while this tariff was
in the possession of the agent, for the purpose of this
lawsuit, his not knowing what the tariff was and
saying to the respondent that he did not have the tariff,
was the same as the tariff not being in his possession.
Railroad v. Sloop, 200 Mo. 198. (3) Respondent says
that the evidence shows that the rate at Marston was
not posted nor in the office at all.

STATEMENT.—Suit to recover $309.32 exacted from
plaintiff at the destination of shipments, in excess of
the freight rate quoted by defendant's station agent
and stated in the bills of lading. The trial was to the
court and the finding and judgment for plaintiff. De-
fendant appealed.

The evidence adduced on behalf of plaintiff tended
to prove the following state of facts: In December,
1908, plaintiff went to the station of defendant at Lil-
bourn, Missouri, and inquired of defendant's agent
there the freight rate on corn from Lilbourn, Missouri,
and Marston, Missouri, to Birmingham, Alabama.
Marston and Lilbourn were six miles apart and were
separate stations in charge of different agents. The
agent told him that he did not know what the rate was;
looked for it and said he could not find it, that he did

not have that rate in his office, but would wire and get it. A day or two afterwards the agent told plaintiff that the rate was fourteen cents per 100 pounds, the same as it was to New Orleans. Thereupon plaintiff sold and shipped three cars of corn from Lilbourn to Birmingham, and the agent inserted the rate of fourteen cents per 100 pounds in the bills of lading, and at the same time he sold and shipped two cars of corn from Marston to Birmingham, and the agent at Marston inserted the same rate in the bills of lading. He sold the corn, delivered at Birmingham, at a price based on the fourteen cent rate thus quoted. When the corn arrived at destination, the defendant exacted, and plaintiff paid under protest, twenty-four cents per 100 pounds as the freight charge. The excess so exacted over the rate quoted by the Lilbourn agent was $309.32, which the plaintiff sued for and recovered herein.

The evidence on behalf of defendant tended to prove that in order, under the Intersate Commerce Act, to establish the twenty-four-cent rate from Lilbourn to Birmingham and from Marston to Birmingham, it had filed a schedule showing that rate with the Interstate Commerce Commission and had furnished a printed copy to its freight office at Lilbourn; that such printed copy was in the hands of the Lilbourn agent, but he did not know how to find the rate thereon when plaintiff asked for it. The rate he quoted was based on misinformation from another station agent. Defendant did not post copies of said schedule in two conspicuous places in its station at Lilbourn for the information of the public, as contemplated by said act, but instead posted a notice stating that such schedule was on file in the office and could be inspected on application to the agent. There was no evidence that the defendant had furnished a copy of said schedule to its freight office at Marston or that any copies thereof

or notice referring thereto were posted in the station at Marston.

The defendant offered and the court refused to give three instructions, the defendant duly excepting. The first was a demurrer to the evidence offered at the close of all the evidence. The next was as follows:.

"The court declares the law to be that if it finds from the evidence that the freight rates on the shipment of corn by railroad from Lilbourn, Missouri, and Marston, Missouri, to Birmingham, Alabama, at the time plaintiff made his shipment, was provided for by Southeastern Tariff No. 2, Interstate Commerce Commission No. 6, issued July 25, 1908, and said schedule of rates had been printed and filed with the Interstate Commerce Commission on the 25th day of July, 1908, and became effective on September 1, 1908, and were in effect until March 1, 1909, and printed copies thereof, after the filing of the same and before the shipment by plaintiff of the corn in question or before any arrangement was made by him for the shipping thereof, with defendant's agent at Lilbourn, Missouri, had been furnished to defendant's depot and freight agent at Lilbourn, Missouri, by the defendant, and the same were then on file with said agent at his office at the depot of defendant, then and in that case the rates of freight for the shipment of corn between said stations provided for in said tariff became the rates imposed by law, and could not be changed in any respect or particular by any agreement between the plaintiff and defendant's agent at Lilbourn, even though they were both mistaken in the freight rates and defendant's agent at Lilbourn quoted the plaintiff a rate of fourteen cents per hundredweight, instead of twenty-four cents per hundredweight as fixed by said tariff, if in truth and in fact the said rate was twenty-four cents per hundredweight, as fixed by said tariff; and in that case the agent of defendant at Birmingham, Alabama, was authorized, and it became his duty to collect at

Birmingham, Alabama, the lawful rate of twenty-four cents per hundredweight, as freight on the shipment of plaintiff's corn between Lilbourn and Marston, Missouri, and Birmingham, Alabama; and this is so, even though the court should further find from the evidence that copies of said printed schedules for the use of the public had not been posted and were not posted at the time plaintiff made his agreement with defendant's said agent, or at the time of shipment, in two public and conspicuous places in its depot where passengers and freight were respectively received at Lilbourn, Missouri, for transportation, in such form that they were thus accessible to the public."

The last is sufficiently like the preceding one to make its reproduction here unnecessary.

CAULFIELD, J. (after stating the facts).—I. The demurrer to the evidence was properly overruled. Plaintiff made a prima facie case by showing the rate of affreightment inserted in the bills of lading to be fourteen cents and that the defendant had exacted at destination,· and plaintiff had paid under protest, the amount sued for in excess of that rate. "Ordinarily the rate of affreightment inserted in a bill of lading is binding on the parties, and will be effectuated by the courts as agreed compensation for the services contemplated." [Railroad v. Horne, 106 Tenn. 73, 59 S. W. 134; Wabash Ry. Co. v. Sloop, 200 Mo. 198, 98 S. W. 607.] It is true that the parties could not by agreement, mistake or otherwise, fix a rate on an interstate shipment, different than that, if any, established and in force under the Interstate Commerce Act. But certain steps must have been taken by the carrier in order to establish a rate under that act so as to affect the public, and the burden of showing that these steps have been taken rests upon the carrier. [Wabash Ry. Co. v. Sloop, and Railroad Co. v. Horne, supra.] These steps are filing the schedule with the Interstate Com-

merce Commission and publication of it. "The publi-
cation intended consists in promulgating and distribut-
ing the tariff in printed form preparatory to putting
it into effect." [United States v. Miller, 223 U. S.
599.] It contemplates the furnishing by the railroad
company of copies to its freight offices. [Texas &
Pac. R. Co. v. Cisco Oil Mill, 204 U. S. 449.] The only
evidence offered in that respect in the case at bar was
the testimony offered by the defendant of the station
agent at Lilbourn to the effect that the schedule had
been furnished his office before the transaction in ques-
tion with plaintiff had occurred. The probative value
of his testimony depended upon his credibility, which
was for the trier of the fact to determine, and a demur-
rer to the evidence, based, as it must have been, on the
theory that such testimony was conclusive, was prop-
erly refused.

II.  The trial court cannot be held to have com-
mitted error or to have indicated that it entertained an
erroneous view of the law by refusing the declarations
of law offered by defendant, because those declara-
tions were erroneous in this, that they declared in effect
that the rate from *Marston* was established by filing a
printed copy of the schedule showing it with the Inter-
state Commerce Commission and furnishing printed
copies of such schedule to defendant's depot and
freight agent at *Lilbourn*. The Interstate Commerce
Act, as it stood in 1908 (1909 Supplement, Fed. Stat.
Ann., pp. 260, 261) declared, "That every common
carrier subject to the provisions of this act shall file
with the commission created by this act and print and
keep open to public inspection schedules showing all
the rates, fares and charges for transportation be-
tween different points on its own route and between
points on its own route and points on the route of any
other carrier by railroad, by pipe line, or by water, when
a through route and joint rate have been established.

. . . Such schedule shall be plainly printed in large type, and copies for the use of the public shall be kept posted in two public and conspicuous places in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be accessible to the public and can be conveniently inspected.'' . . . No change shall be made in the rates, fares, and charges or joint rates, fares, and charges which have been filed and published by any common carrier in compliance with the requirements of this section, except after thirty days' notice to the commission and to the public published as aforesaid, which shall plainly state the changes proposed to be made in the schedule then in force and the time when the changed rates, fares or charges will go into effect; and the proposed changes shall be shown by printing new schedules, or shall be plainly indicated upon the schedules in force at the time and kept open to public inspection: Provided, That the commission may, in its discretion and for good cause shown, allow changes upon less than the notice herein specified, or modify the requirements of this section in respect to publishing, posting, and filing of tariffs, either in particular instances or by a general order applicable to special or peculiar circumstances or conditions. . . . No carrier, unless otherwise provided by this act, shall engage or participate in the transportation of passengers or property, as defined in this act, unless the rates, fares and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this act; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor

shall any carrier refuse or remit in any manner or by any device any portion of the rates, fares and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs. . . .''

In overruling a contention that a tariff is not ''published'' in the ·sense in which the act uses that term and therefore does not go into effect unless printed copies are ''kept posted in two public and conspicuous places in every depot,'' etc.,—a contention which found favor with the Missouri Supreme Court (see Wabash R. R. Co. v. Sloop, 200 Mo. 198, 98 S. W. 607)—the Supreme Court of the United States said:

''Publication and posting in the sense of the act are essentially distinct. This is the import of the provision that the requirements relating to 'publishing, posting and filing' may be modified by the commission in special circumstances, for if publishing included posting, mention of the latter was unnecessary. · And from all the provisions on the subject, it is· evident that the publication intended consists in promulgating and distributing the tariff in printed form preparatory to putting it into effect, while the posting is a continuing act enjoined upon the carrier, while the tariff remains operative, as a means of affording special facilities to the public for ascertaining the rates in force thereunder. In other words, publication is· a step in establishing rates, while posting is a duty arising out of the fact that they have been established.' [U. S. v. Miller, 223 U. S. Repts. 599, 604.]

This is a recent authoritative declaration by the highest tribunal in the land that ''publication'' is a step in establishing rates, and that publication means ''promulgating and distributing the tariff in printed form.'' Where a law required a railroad company to ''promulgate'' a rule, it was held that ''promulgation

is to make known. It means that such rule shall be brought to the attention of the servants affected thereby, or that it be given such publicity as that the servant, in the proper discharge of his duties, is bound to take notice of it." [Wooden v. Western New York, etc., R. R. Co., 18 N. Y. Supp. 768.] We take it the United States Supreme Court must have meant by "promulgating and distributing" the furnishing of the tariff in printed form to each freight office for which a tariff rate is sought to be established. It so indicated in a previous case, where, in holding "posting" to be unnecessary it said: "The filing of the schedule with the commission and the furnishing by the railroad company of copies to its freight offices incontrovertibly evidenced that the tariff of rates contained in the schedule had been established and put in force." [Texas & Pac. Ry. v. Cisco Oil Mill, supra.] And such is the common sense of the matter, for how could a tariff for a station, say Marston, be put into effect without making it known to the one in charge of that station or by making it known only to the agent of Lilbourn, another station of equal rank? A local station agent's authority extends only to the control of the company's business at his own station. [1 Elliott on Railroads (2 Ed.), sec. 303.] Of course we do not hold that in order to show that a rate had been established for a particular station, the printed schedule showing that rate need to be shown to have been sent to all other stations, the rates for which are included in such schedule, but we are of the opinion that to prove the establishing of a rate for a particular station it must be shown that the printed schedule had been furnished to that station or to the agent in charge thereof. It would have been error therefore to declare in effect that the rate for Marston was established by furnishing a printed copy of the schedule to "defendant's depot and freight agent at Lilbourn."

The declarations of law offered by the defendant were properly refused.

The judgment is affirmed. *Reynolds, P. J.,* and *Nortoni, J.,* concur.