## ST. LOUIS, SOUTHERN RAILWAY COMPANY OF TEXAS, Appellant,. v. SPRING RIVER STONE COMPANY, Respondent.

Springfield Court of Appeals, March 3, 1913.

1. CARRIERS OF FREIGHT: Rates: Differences Between Carrier and Shipper as to: Settlement Conclusive. A carrier and shipper cannot enter into a binding agreement for a different rate on . an interstate shipment than that prescribed by the schedule filed with the Interstate Commerce Commission. Nevertheless, the parties to this litigation, having reached a settlement of their differences and payment thereunder having been made, into which no fraud, disception or mistake appears to have entered, such agreement is a bar to further controversy. [Per ROBERTSON, P. J., FARRINGTON and ̇STURGIS, JJ., dissenting.]

2. ————: Settlement has Binding Force of Judgment: Can Only be Attacked in a Proceeding in Equity. Such a settlement has the binding force and effectiveness oḟ a judgment

and can only be attacked by a direct proceeding in equity on the ground of fraud or mistake. [Per ROBERTSON, P. J., FARRINGTON and STURGIS, JJ., dissenting.]

3. CARRIERS OF FREIGHT: Rates: Differences Between Carrier and Shipper: Rule of Settlement Not Applicable. The rule of law which forbids the opening of a settlement of a controversy or the adjustment of a difference under a misunderstanding has no application to this case, because the act of Congress has entirely taken the right to contract and the authority to settle away from both the carrier and shipper. [Per FARRINGTON, J., STURGIS, J., concurring.]

4. ————: ————: Would Render Nugatory Interstate Commerce Law. To prohibit the parties from contracting in their own right and yet permit them to settle or compromise their differences as to rates would render nugatory the purpose of the Interstate Commerce Law. [Per FARRINGTON, J., STURGIS, J., concurring.]

5. INTERSTATE COMMERCE COMMISSION: Rates: Rules and Regulations: Must Be Strictly Complied With. The carrier and shipper must comply strictly with the tariffs, rules and regulations of the Interstate Commerce Commission regarding the rates concerned in any transaction, and the courts are not given discretion to relieve against seeming injustices arising under particular cases. [Per FARRINGTON, J., STURGIS, J., concurring.]

6. ————: Rates: Differences Between Carriers and Shippers as to: Must Be Hearing Before Interstate Commerce Commission in First Instance. Where differences arise between carrier and shipper with reference to rate to be charged under the rules and regulations of the Interstate Commerce Commission, or with reference to damages accruing for failure to perform certain duties required under said rules and regulations, before the injured party can proceed in the courts for redress he must first obtain a finding and order in his favor from the Interstate Commerce Commission. [Per FARRINGTON, J., STURGIS, J., concurring.]

7. BILL OF LADING: A Contract of Carriage: Oral Testimony Cannot Contradict. The bill of lading reduced to writing and delivered by the carrier to the shipper, is a contract of carriage, fixing the amount of freight to be charged and is not subject to be varied or contradicted by oral testimony. [Per FARRINGTON, J., STURGIS, J., concurring.]

8. ————: Binding on Shipper. It is the duty of the shipper to read the bill of lading and if plain and intelligible he is bound by its contract terms. [Per FARRINGTON, J.]

9. ————: **Necessary Notations On.** To hold it to be the duty of the carrier alone to see that all proper notations are made on the bill of lading and waybill, and that the carrier's failure to make them affords an excuse for evading the schedule rate, would open the way for discrimination, and render ineffectual the schedule rate. [Per FARRINGTON, J., STURGIS, J., dissenting.]

10. **CARRIERS OF FREIGHT: Rates: Failure to Post; not a Condition Precedent.** The binding effect of the tariff rate filed by carriers with the Interstate Commerce Commission, does not depend upon the posting of copies thereof by carrier's local agent. The posting of these rates is merely a means of information to those interested and is not a condition precedent to putting the rates into effect. [Per STURGIS, J., FARRINGTON, J., concurring.]

11. ————: **Rate Filed With Interstate Commerce Commission: Effect of.** The interstate Commerce Act makes the published rate of a carrier a contract with all the world and deprives both carrier and shipper of the power to make individual rate contracts which would be a substitute for or a change of the one uniform contract filed. A carrier's agent can only give information as to what that rate is; he cannot alter it. [Per STURGIS, J., FARRINGTON, J., concurring.]

12. **BILL OF LADING: Mistake in or Omission From: Attributable to Carrier.** A bill of lading is a receipt which the Interstate Commerce Act requires common carriers to give to the shipper, showing that the property therein specified has been received by the carrier for transportation. Irrespective of whether the carrier or the shipper performs the clerical work of filling out the blank forms, it is the carrier's bill of lading and it is incumbent on the carrier to see that all necessary and proper notations are made thereon, and failure to do so is attributable to the carrier.

13. **CARRIER OF FREIGHT: Cannot Profit From its Own Neglect or Wrong.** Where a shipper ordered a car of certain capacity, and the carrier for its own convenience furnished a car of larger minimum capacity, the shipper by using the car thus furnished does not subject himself to payment for excess weight up to the minmum capacity of the car thus used. It is solely the fault of the carrier that the smaller minimum capacity car was not furnished and used. Neither should the neglect of the carrier to note on its bill of lading the reason for the use of the larger car subject the shipper to payment of a higher rate on the commodity shipped by him. Such a holding would allow the carrier to reap a benefit from its own wrong or neglect.

Appeal from Jasper Circuit Court, Division Number Two.—*Hon David E. Blair,* Judge.

AFFIRMED.

*S. H. West, McReynolds & Halliburton,* and *Roy F. Britton* for appellant.

1.   Common carriers by railroad engaged in interstate commerce are required by the acts of Congress regulating commerce to collect the rates published in the schedules or tariffs on file with the Interstate Commerce Commission. Act of Feb. 4, 1887, U. S. Comp. Stat. 1901, p. 3158; amended by the Act of June 29, 1906, U. S. Comp. Stat. Sup. 1909, p. 1153, as amended by the Act of June 18, 1910, U. S. Comp. Stat. Sup. 1911, p. 1284; Railroad v. Hefley, 158 U. S. 98; Railroad v. Mugg, 202 U. S. 242; Packing Co. v. United States, 209 U. S. 56; Railroad v. Cotton Oil Co., 204 U. S. 426; Railroad v. Oil Mill Co., 204 U. S. 449; Commission Co. v. Railroad, 223 U. S. 573; Grain Co. v. Railroad, 12 I. C. C. Rep. 418; Blinn v. Railroad, 18 I. C. C. Rep. 430; Gerber v. Railroad, 63 Mo. App. 145.   (2)   Shippers are presumed to know the provisions of tariffs duly published and filed with the Interstate Commerce Commission, and rates named in such tariffs are not the subject of contract between carriers and shippers. Railroad v. Kirby (1912), 32 Sup. 648; Railroad v. New Albany B. & B. Co., 94 N. E. Rep. 906; Mires v. Railroad, 134 Mo. App. 379.   (3)   The shipping ticket prepared by respondent's employee and signed by appellant's agent is a "bill of lading." A bill of lading is the carrier's receipt for goods delivered to it for transportation. It may also contain the contract of carriage, but this is not necessary to make the instrument a bill of lading. Porter on Bills of Lading; Standard Dictionary; Webster's New International Dictionary; Century Dictionary; Cope v. Cordova. 2

Rawle (Pa.), 202; The Mayflower, 16 Fed. Cas. 1250; Hutchinson on Carriers. (4) Secondary evidence as to the contents of a written instrument is admissible where the original is beyond the jurisdiction of the court, or beyond the control of either party. Wigmore on Evidence, 1211-1213; Brown v. Wood, 19 Mo. 475; Afflick v. Streeter, 136 Mo. App. 712; Harvey v. Herrman, 39 Mo. App. 214. (5) A tariff provision designed to change or effect interstate rates or charges will not be effective unless such provision is published, filed and strictly complied with. Item 81 of Texas Tariff 42-B. I. C. C., No. 524, in effect at the time these shipments were made, provides that when shippers order cars of specified capacity in writing, and the order is noted on the bill of lading, the capacity of the car ordered will be the minimum weight, but as neither of these conditions was complied with, the marked capacity of the car used is the minimum weight as provided in the tariff.

*Thomas & Hackney* for respondent.

(1) While the tariff rates, rules and regulations filed with the Interstate Commerce Commission become binding on the carrier and the shipper by reason of such filing, yet if the carrier negligently fails to post these rates, etc., in its station (which appears to have been the cause of the trouble in this case), it becomes liable to the shipper for damages sustained in consequence of such neglect. Railroad v. Lewellen Bros., 192 Fed. 540; Railroad v. Elevator Co., 138 Ky. 220, 127 S. W. 777; Freeman v. Kemendo, 148 S. W. 605. (2) Under item 81 of the rule read in evidence, it was the duty of the carrier to indorse on its bill of lading and waybill in each case the capacity of the car ordered, the number of the order and date of same, where a smaller capacity car had been ordered by the shipper

and a greater capacity car had been furnished for the convenience of the carrier. This duty in the very nature of the case devolved on the carrier who issued these documents, and if in consequence of its failure to discharge its duty, the shipper was required to pay the higher rate, a just claim for overcharge existed in behalf of the shipper. Authorities, supra. (3) Where a carrier quoted a legal rate but failed to advise the shipper of a certain limitation attached to it, and as a consequence the shipper failed to sign the released valuation clause, because of which he was forced to pay the higher rate, reparation was awarded. Cotton Oil Co. v. Railroad, 18 Interstate Com. Rep. 180; Cotton Oil Co. v. Railroad, 19 Interstate Com. Rep. 79; Miller & Lux v. Railroad, 20 Interstate Com. Rep. 129. (4) Where as in this case a settlement is made, and with full knowledge of all of the facts money is paid, even under a mistake of law, it cannot be recovered back by the party making the payment. Campbell v. Clark, 44 Mo. App. 249; State ex rel. Scotland Co. v. Ewing, 116 Mo. 129; Corbin v. Adair Co., 171 Mo. 385; Hethcock v. Crawford Co., 200 Mo. 170; Trust Co. v. Bank, 154 Mo. App. 89, 108. (5) The basis of an action for a refund of money paid is that the defendant has received money which *ex aequo et bono*, he ought to refund. 2 Ency. P. & P. 1016.

ROBERTSON, P. J.—Plaintiff sued defendant in the circuit court to recover $323.12 from defendant and based its claim thereto on the following facts: In 1908 defendant was operating a stone quarry at Carthage, Missouri, and was negotiating with one J. B. Hoffman of Ft. Worth, Texas, for the sale of five cars of stone to be delivered to Hoffman at Ft. Worth. Defendant called upon the commercial agent of the plaintiff for a quotation of freight rates and received a quotation of 27½ cents per hundred pounds on cars of 50,000 pounds minimum capacity, the agent designating the St. Louis

& San Francisco Railroad Company, which had a station and freight office at Carthage, as the initial carrier. Upon this information the defendant quoted Hoffman a price on five 50,000-lb. cars of stone to be delivered at Ft. Worth. This offer was accepted and the defendant company ordered 50,000-lb. cars in each case, but not having that capacity accessible the railroad company furnished in each case cars of greater marked capacity than were ordered by the defendant. Defendant loaded the stone and estimated the weight, according to its dimensions, which was approximately correct, but as the railroad company had no facilities at Carthage for weighing the cars they were not weighed by the railroad company until they reached Monett en route to their destination. The correct weight was slightly in excess of the estimated weight. The shipments were made between November 30, 1908, and December 29 of the same year and when the shipments reached the destination plaintiff attempted to exact freight according to the marked capacity of the cars instead of according to the capacity ordered, though in fact the amount paid by the defendant corresponded neither to the actual nor the estimated weight of the shipments and was $30.52 less than the freight would have amounted to upon the marked capacity of the cars. On February 4, 1909, before defendant knew the actual weight of the shipments, it made a written demand upon the claim agent of plaintiff for $287.78 overcharge, giving the estimated weight. After making this claim the defendant on February 6, 1909, after learning the correct weight of the cars, reduced its claim to $263.73; and thereafter the commercial agent of the plaintiff went to Carthage, made a full investigation and soon thereafter the defendant was paid $270.60 on account of the supposed overcharge.

The plaintiff bases its right to recovery in this case upon the theory that the act of Congress, commonly called the Interstate Commerce Act, to regulate

commerce and the tariffs and schedules filed in obedience thereto, fixed the rate on this character of shipments at $27\frac{1}{2}$ cents per hundred pounds when the cars ordered and used were loaded to their capacity, but that by virtue of a rule then applicable in this territory that when the carrier could not furnish a car of the capacity ordered by the shipper and for its own convenience provided a car of greater capacity than the one ordered by the shipper, it might use this car on the basis of the minimum carload weight fixed in the tariff applied on the size of the car ordered by the shipper, but in no case less than the actual weight, the capacity of car ordered, number of the order and date of same to be shown in each instance on the bill of lading and the carrier's waybill, and that in this instance the required notations were not made on the waybill nor on the bill of lading and that, therefore, the plaintiff in the first instance should have collected $27\frac{1}{2}$ cents per cwt. on the marked capacity of the cars.

It was conceded at the trial by plaintiff's counsel that when the defendant made its claim for the rebate and when the plaintiff adjusted and paid it that there was no intention upon the part of either of them to violate the law.

The trial below was to a jury and at the conclusion of the plaintiff's testimony the court directed a verdict in favor of the defendant. There is no controversy here as to the facts material to a decision of this case.

In the case of State ex rel. v. Ewing, 116 Mo. 129, 22 S. W. 785, an action was brought upon the official bond of the county collector to recover certain sums retained by him on settlements for commissions in excess of what was due him under the law. The defendants in that case, as in this, pleaded the settlements in bar, and at the conclusion of the testimony the court directed a verdict for the defendants. That case in principle is not different from this. The facts in that

case were that the county collector had charged and withheld greater commissions on sums collected than he was allowed by law, but the contention in behalf of the county was that as the commissions had been allowed by the county court upon a settlement with it contrary to law the defendants could not plead settlement. The defendants' contention was that notwithstanding the collector was allowed by the county court upon a settlement more by way of commissions than he was entitled to receive, the settlement with the county court had the binding force and conclusiveness of a judgment and could only be attacked by a direct proceeding in equity on the ground of fraud or mistake. This contention was ruled against the defendants and it was held that the settlement could be inquired into and mistakes corrected in like manner as between individuals acting in their own behalf, and it was held that the settlement was binding on the county. A similar case is also found in State ex rel. v. Shipman, 125 Mo. 436, 28 S. W. 842.

In the case of Corbin v. Adair County, 171 Mo. 385, 71 S. W. 674, the circuit clerk undertook to recover fees paid by him into the county treasury under a mistake of fact, to which he was as a matter of law entitled at the time of his payment, but the court held that his action could not be maintained. To the same effect also is the opinion in the case of Hethcock v. Crawford County, 200 Mo. 170, 98 S. W. 582.

While it may be true, as contended by plaintiff, that the parties to this litigation could not have entered into a binding agreement for a different rate from that fixed by the rules, tariffs, etc., under the act of Congress, nevertheless they have settled, as between themselves, their respective civil liabilities on account of the shipments, and it is as essential in this case as in the cases where public officials received more than they were entitled to by law, that the right of controversy between the parties be foreclosed by their settlement;

and it is our duty to follow the decisions of the Supreme Court. The judgment of the circuit court is affirmed. *Sturgis, J.*, concurs in the result in a separate opinion. *Farrington, J.*, dissents in a separate opinion.

## DISSENTING OPINION OF FARRINGTON, J.

STATEMENT.—The respondent, operating a stone quarry at Carthage, Missouri, received a request from one J. B. Hoffman of Ft. Worth, Texas, for quotations on five cars of stone. Respondent thereupon called upon the commercial agent of the appellant for quotations of rates and received a letter quoting twenty-seven and one-half cents per hundred pounds on cars of 50,000 pounds minimum capacity. Respondent then made a bid for delivered price of the stone, and this bid was accepted. The appellant was notified that respondent would require five cars, each of 50,000 pounds minimum capacity, in which to ship the stone, the cars to be routed on the St. Louis & San Francisco Railroad to Jonesboro, Arkansas, and from there on the appellant's route to Ft. Worth, Texas. The respondent's agent ordered the cars as they were needed over the telephone, and in each instance ordered a 50,000 pound capacity car. There being a scarcity of such cars, the company for its own convenience furnished five cars of 80,000 pounds minimum capacity each. The respondent loaded these 80,000 pounds capacity cars as though they had been 50,000 pound capacity cars. When the shipment reached Ft. Worth, the consignee was called upon and required to pay freight on the basis of 80,000 pound capacity cars instead of on the basis of 50,000 pound capacity cars, making the difference in the total amount that he was required to pay (as appellant figured on the basis of 80,000 pound capacity cars) $270.60 more than would have been required on five 50,000 pound capacity cars.

The respondent in due time made claim for that amount, and the appellant sent its adjusting agent and representative to Carthage, who, after going over the entire matter with the railroad company's agent and the officers of the respondent, agreed with them that they had been overcharged and repaid them the sum of $270.60. The appellant later claimed that under the tariff schedules and rates prescribed by the Interstate Commerce Commission the repayment of the $270.60 was a violation of the rules and regulations of the Interstate Commerce Commission, and that respondent not only owed the $270.60 which had been repaid, but an additional amount, making the total amount alleged to be due the appellant, $323.12, and that this amount was due by a correct figuring of the rate on the cars in which the stone was actually shipped. The appellant demanded payment of the respondent which was refused and suit was instituted in the circuit court of Jasper county.

The plaintiff (appellant) introduced in evidence at the trial the copies of the tariffs filed with the Interstate Commerce Commission governing this shipment. Item 54 of this schedule provides that "the minimum weight will be the marked capacity of the car," etc. Plaintiff also introduced in evidence the following item:

"Supplement No. 6 to Texas Tariff. 42-B, Effective November 29, 1908:

"Effective September 10, 1908. Stone: Building (Not Granite or Marble), Flagging and Paving, Rough Quarried, Sawed or Dressed, Including Artificial Moulded Stone (Not Polished, Lettered or Figured) and Stone crushed, minimum weight, 50,000 pounds, 27½ cents per 100 pounds from Kansas City territory to points taking Ft. Worth-Dallas Group Rates."

Plaintiff also introduced item No. 81, under the head of "Rules" in Texas Tariff No. 42-B, as follows:

"MINIMUM WEIGHT ASSESSED, BASED 81 ON CAPACITY OF·
CAR SHIPPER MAY ORDER."

"The following rule will be observed in assessing
the freight charges for minimum weights, according
to capacity of car: 'When the carrier cannot furnish
car of capacity ordered by shipper, and for his own
convenience provides a car of greater capacity than the
one ordered by the shipper, it may be used on the basis
of the minimum carload weight fixed in tariff applied
on size of car ordered by shipper, but in no case less
than the actual weight, capacity of car ordered, num-
ber of the order, and date of same to be shown in each
instance on the bill of lading and the carrier's waybill.'
In no case must shipment be billed at minimum weight
of a car of less capacity than in service on initial line."

Plaintiff also introduced the following writing
(being the same as four others introduced—one for
each car) which the plaintiff insists on calling a bill of
lading and which defendant insists on calling a
shipper's ticket.

## ST. LOUIS AND SAN FRANCISCO R. R. CO.

Carthage, Mo., 12-18,1908.

Will please receive the following freight to be
forwarded subject to the Rules of Transportation,
printed on its regular Shipping Bills, said rules being
agreed to by the shippers, addressed to

*J. B. Hoffman,*
*Ft. Worth, Tex.*

Via Frisco Care of Cotton Belt at Jonesboro, Ark.

*No. and Description of Packages*                    *Weight*

Stone

Car No. 1110, M. & N. A. .................. 51,000
Less 500 lbs. for stakes.

### NOT NEGOTIABLE.

This shipment is tendered and received subject to
the terms and conditions of the Company's Uniform

Bill of Lading. All conditions herein to the contrary are cancelled.

Shipper's Signature        *Spring River Stone Co.*
Agent's Signature            *A. W. Munday*

SPRING RIVER STONE CO., Shipper.

At the close of plaintiff's evidence, the court directed a verdict for the defendant, and the case is here on plaintiff's appeal.

. The issues presented to this court may be stated in small compass, viz.: The respondent ordered by telephone five 50,000 pound capacity cars. The freight has been paid by respondent to cover the shipment if the stone had been shipped in 50,000 pound capacity cars. For the convenience of the appellant, 80,000 pound capacity cars were furnished. The Interstate Commerce Commission's rules require that freight be figured on the minimum marked capacity of the car used, unless there has been an order for a smaller capacity car than that furnished, in which event the minimum rate will be figured on the shipment according to the minimum carload ordered, provided the capacity of the car ordered, the number of the order, and the date of the same, be shown in each instance on the bill of lading and the carrier's waybill. In the present case, no such notations appear; in the absence of which the appellant contends that it must collect, under the rules and regulations of the Interstate Commerce Commission, the total amount of freight, figured on 80,000 pound capacity cars. The respondent contends that it was the duty of the appellant to place these notations on the bill of lading and the waybill, and that, in any event, after the appellant's attention had been called by them to a mistake in the amount of freight charged, and when their agent came to Carthage and investigated the whole matter and granted the demand of the respondent for a refund, that settled the matter so far as respondent and appellant were

concerned. · It is agreed that both respondent and appellant in making the settlement at Carthage acted in good faith and were settling under their understanding of the tariff schedules the exact amount of freight due.

It does not appear that the tariff schedules were posted in the depot, as provided by the rules of the Interstate Commerce Commission. Respondent did not file any counterclaim for damages for a failure to so post, or for damages for not making the proper notations on the bill of lading and waybill.

## OPINION.

FARRINGTON, J.—It is no longer a mooted question that the shipper and carrier cannot contract for a different rate on an interstate shipment than that prescribed by the schedules filed with the Interstate Commerce Commission and under the rules and regulations promulgated by it. And it can no longer be contended that it is not the law of the land that the shipper is conclusively presumed to know the schedule of rates and the rules and regulations of the Interstate Commerce Commission even though the carrier fail to post the tariffs as required in its various stations, whatever may have been held in this and other states to the contrary. The Constitution of the United States (Art. VI) provides: "This Constitution and the laws of the United States which shall be made in pursuance thereof, . . . shall be the supreme law of the land; and the judges in every State shall be bound thereby, . . . ;" and this certainly means that State courts are bound by the laws of the United States as construed by the federal Supreme Court.

In the case of Texas & Pacific Ry. Co. v. Cisco Oil Mill, 204 U. S. 449, 51 L. Ed. 562, 27 Sup. Ct. Rep. 358, it is held that interstate freight rates are established when a schedule is filed by a carrier with the Interstate Commerce Commisison and copies are furnished by

the railway company to its freight officers, although such rates may not be posted as required by section 6 of the act to regulate commerce, as amended March 2, 1889 (25 Stat. at L. 855, Chap. 382, U. S. Comp. Stat. 1901, p. 3158), the posting merely affording special facilities to the publc for ascertaining the rates actually in effect; and it is also held that the carrier and the shipper have no power to contract with reference to the rates—they being fixed by the schedule.

The case of Texas & Pacific Ry. Co. v. Mugg & Dryden, 202 U. S. 242, 50 L. Ed. 1011, 26 Sup. Ct. Rep. 628, adopts the opinion of Chief Justice BRICKELL in the case of Southern R. Co. v. Harrison, 119 Ala. 539, 24 So. 552, in which the following language was used: " . . . whatever be the rate agreed upon, the carrier's lien on the goods is, by force of the act of Congress, for the amount fixed by the published schedule of rates and charges, and this lien can be discharged, and the consignee can become entitled to the goods, only by the payment, or tender of payment, of such amount. Such is now the supreme law, and by it this and the courts of all other States are bound."

In the case of Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 51 L. Ed. 553, 27 Sup. Ct. Rep. 350, it was held that suits could not be brought in the State courts by shippers against carriers to test the reasonableness of and to recover an alleged overcharge when the rate charged by the carrier was in accord with the schedule filed with the Interstate Commerce Commission, the reason therein pointed out being that different courts and juries passing on the cases brought before them could not and would not fix the "reasonable amount" to be the same, from which there would necessarily flow confusion in the rates to be charged and there would follow discrimination in favor of some and against others, which would, in effect, destroy the purpose for which the act of Congress was enacted. The opinion in the case concludes as follows:

"Concluding, as we do, that a shipper seeking reparation predicated upon the unreasonableness of the established rate must under the act to regulate commerce, primarily invoke redress through the Interstate Commere Commission, which body alone is vested with power originally to entertain proceedings for the alterration of an established schedule, because the rates fixed therein are unreasonable, it is unnecessary for us to consider whether the court below would have had jurisdiction to afford relief if the right asserted had not been repugnant to the provisions of the act to regulate commerce. It follows, from what we have said, that the court below erred in the construction which it gave to the act to regulate commerce."

Mr. Justice WHITE, in the case of New York, N. H. & H. R. Co., 200 U. S. 361, 391, 50 L. Ed. 515, 521, 26 Sup. Ct. Rep. 272, 277, used this language: "The all-embracing prohibition against either directly or indirectly charging less than the published rate shows that the purpose of the statute was to make the prohibition applicable to every method of dealing by a carrier by which the forbidden result could be brought about. If the public purpose which the statute was intended to accomplish be borne in mind, its meaning becomes, if possible, clearer." And this language was approved in the case of Armour Packing Co. v. United States, 209 U. S. 56, 52 L. Ed. 681, 28 Sup. Ct. Rep. 428.

That the shipper and the carrier cannot fix a different rate from that fixed in the schedule is again held in the case of Kansas City Southern Ry. Co. v. Albers Com. Co., 223 U. S. 573, 56 L. Ed. 556, 32 Sup. Ct. Rep. 316.

In the case of Robinson v. Baltimore & O. R. Co., 222 U. S. 506, 56 L. Ed. 288, 32 Sup. Ct. Rep. 114, it is held that before a shipper may recover from the carrier the excess he claims to have paid under a regularly established and published rate which he attacks as unjustly discriminatory, he must, as a prerequisite,

have the investigation and appropriate finding of the Interstate Commerce Commission.

The decisions of this State hold that the fixing of the rate to be charged different from that fixed by the schedule is no longer an open question. It is not a matter concerning which the shipper and carrier have a right to contract, either in the initial contract for shipment, or in a subsequent contract of settlement or adjustment, or by a rebate. [See, Dunne & Grace v. Railroad, 166 Mo. App. 372, 148 S. W. 997.] In that case, a rate different from that fixed in the schedule filed with the Interstate Commerce Commission was agreed upon. When the consignment arrived at its destination in Kentucky a greater amount was demanded of the shipper than that fixed by the schedule, which was paid under protest. The shipper brought suit to compel the carrier to refund the amount paid over and above that agreed upon, and in the trial court he prevailed. When the case reached the appellate court, it found that neither the amount agreed upon in the initial contract nor the amount charged at destination was the amount fixed by the schedule, and that court found what the schedule rate would be and directed the trial court to enter judgment for that amount. Similar holdings will be found in the cases of Drey & Kahn Glass Co. v. Railway Co., 156 Mo. App. 178, 136 S. W. 757, and Sutton v. Railroad, 159 Mo. App. 685, 140 S. W. 76.

In the enactment of the act under consideration, Congress was proceeding within its constitution-given right to regulate commerce among the several States, and, as at all times, had the general welfare of the nation and its people in view; and the law, as enacted, plainly shows that both of these features had a place in the minds of the lawmakers. The rate fixed for the transportation of freight is a *fact* fixed by law, as much so as that a dollar is one hundred cents, and an attempt to vary this fact by contract would be as in-

effectual as an attempt by contract to change the fact that one dollar is one hundred cents.

In the case of Wabash R. Co. v. Sloop, 200 Mo. 198, 98 S. W. 607, it was held that the schedule must be posted by the carrier and that proof of such posting is necessary in order for the carrier to recover the difference between the amount paid and the schedule rate. It will be noted, however, that this case was decided in December, 1906, prior to the decision of the Supreme Court of the United States in the case of Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., and in the case of Texas & Pacific Ry. Co. v. Cisco Oil Mill, both supra, the latter case being directly opposed to the holding in Wabash R. Co. v. Sloop.

The Supreme Court of the United States being the final arbiter on this question, its decisions are the law of the land and must be followed by all other courts, whether State or federal; and when that tribunal has passed upon a question as to which it is the final arbiter, it becomes this court's duty to fall in line with that decision, notwithstanding a different holding by the Supreme Court of this State. This rule has been often laid down for our guidance by our own Supreme Court and is reiterated in its last decision on the subject; thus, in Haseltine v. Central Nat. Bank, 155 Mo. 66, 56 S. W. 895, it is held that the construction given a federal statute in the United States Supreme Court must be followed in the State courts, and in Briggs v. Holmstrong, 72 Mo. 337, it is said that a decision of the federal Supreme Court construing an act of Congress is conclusive on the courts of the State of Missouri; also, in Barber Asphalt Pav. Co. v. French, 158 Mo. 534, 58 S. W. 934, it is held that where the facts of a case in a State court bring it within the operation of a rule laid down in a decision of the United States Supreme Court, such decision is binding on the State court. See, also, D. C. Wise Coal Co. v. Columbia Lead & Zinc Co., 123 Mo. App. 249, 100 S. W. 680; Mires v.

St. Louis & S. F. R. Co., 134 Mo. App. 379, 114 S. W. 1052. I therefore take it that it is our duty to follow the last ruling of the Supreme Court of the United States on the question involved in this case because it has to do with the construction of a federal statute, and in doing so we are obeying the mandate of our own Supreme Court in saying that the construction of federal statutes by the federal Supreme Court is binding on all State courts.

The rule of law that forbids the opening of a settlement of a controversy or the adjustment of a difference between parties where there was a misunderstanding of the law does not apply to the present case for the reason that in all such cases where it is so held the parties settling had the power to contract in their own right or were by virtue of law given the authority to settle, while in the present case the act of Congress has taken that power entirely away from both the carrier and the shipper. Such must necessarily be the case on this question of rates and the regulation of freight charges in order that the very purpose of the act, to-wit, equality, shall be universally maintained and discriminations or favors done away with. No confusion will arise if this principle be kept in view as the guiding star in deciding these questions. It can be seen that the object and purpose of the law would be defeated by allowing refunds and rebates under the guise of settlements where alleged or supposed mistakes had been made, and Congress, having in mind this very condition took away from both parties to the contract the power to change the rate in any particular in any manner. They are prohibited from contracting in their own right with reference to the rate and to make the law in any measure effective they must necessarily be prohibited from compromising or settling their differences as to rates. The permission to do the one and not the other would destroy at one blow the purpose of the law.

As we have stated, in the case of Robinson v. Baltimore & O. R. Co., supra, it was held that it was a prerequisite to a recovery by the shipper from the carrier of the excess claimed to have been paid under a regularly established and published rate which he attacks as unjustly discriminatory that he have the proper investigation and finding of the Interstate Commerce Commission. If this, then, be the law, how could the settlement between the shipper and the carrier in this case be relied upon when they merely agreed upon an amount which was not the amount fixed by the schedule and the rules and regulations of the Interstate Commerce Commission? It would surely be as necesary a prerequisite to have the finding of the Interstate Commerce Commission on this question in a settlement, in order to make the settlement binding, as in a recovery in a court of law.

It is, however, contended in this case that the shipper paid the full amount of the freight actually hauled, and that the shipper was not responsible for the failure of the carrier to furnish it the cars it ordered and that it should therefore not be compelled to pay the freight on the 80,000 pound capacity cars when it in fact ordered 50,000 pound capacity cars; and that it was the duty of the carrier and not the duty of the shipper to see that the proper notations were on the bill of lading and waybill as provided by item 81 of the rules and regulations of the Interstate Commerce Commission which has to do with the fixing of rates when this condition exists. If it be held that it was the duty of the carrier to see that these notations were made and that its failure to make them would furnish an excuse to evade the schedule rate, the gate is opened wide for discrimination. The shipper, under the decisions cited, must know the rate to be charged and the basis on which it is charged. As much discrimination could be made by a varying of the capacity of the car used as by a reduction of the

amount to be paid per hundred pounds. In other words, I do not believe the rate fixed stops with the 27 1-2 cents per hundred pounds, but that the rate fixed is 27 1-2 cents per hundred pounds figured on the basis of the minimum capacity car used, which, in this case, was a car of 80,000 pounds capacity. This is constructively known as well by the shipper as by the carrier, and where the shipper actually uses a larger car than the one which he ordered he must know that under the schedule filed with the Interstate Commerce Commission he must pay on the basis of that car, unless, for his protection and benefit there is placed on the bill of lading and the waybill the proper notations. Rule 81 is not only for the convenience of the carrier in permitting it to furnish a larger car than is ordered, but affords a protection to the shipper as well—that is, when the carrier exercises its right to furnish a larger car than is ordered, if the the proper notations are made the shipper will not have to pay on the minimum marked capacity of the car used; which is the general rule. To leave this an open question would necessarily mean discrimination, for, as held in Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., supra, one court and jury might find that it is the shipper's duty and another might hold that it is the carrier's duty and still another might hold that there is a joint duty to see that the proper notations are made. In the one case or the other we would have a shipper getting his freight hauled cheaper than his competitor. Again, we must look to the guiding star which is that the freight rates be fixed, certain and equal as to all.

The recent case of Illinois Cent. R. Co. v. Elevator Co., decided by the Supreme Court of the United States on January 6, 1913 (Adv. Sheets, Feb. 15), holds that although there is a positive duty on the railroad company under the rules and regulations to post its sched-

169 Mo. App.—9

ule of rates, the shipper, although he alleges and proves a failure on the part of the railroad company to observe this rule and proves damages to himself by reason of its failure to post the tariffs, is not entitled to bring a suit in the State court for damages occasioned by such failure on the part of the company. Here was a rule and regulation applying only to the railroad company, a duty to be performed alone by the carrier, yet it was held that the State court was not the tribunal to which the damaged shipper must apply for redress in the first instance. This and the other cases cited, show that the Supreme Court of the United States has held and intends to hold that where differences arise between shipper and carrier with reference to the rate to be charged under the rules and regulations of the Interstate Commerce Commission or with reference to the damages that may accrue for failure to perform certain duties that are required to be performed under said rules and regulations, the injured party, before he can proceed in the courts for redress must first get a finding and order in his favor by the Interstate Commerce Commission. In other words, the Supreme Court of the United States in its decisions, as I understand them, holds that the carrier and the shipper must comply strictly with the tariffs and with the rules and regulations of the Interstate Commerce Commission regarding those rates and which shall govern their transactions, and that the courts are not given discretion to relieve against hard particular cases arising thereunder, lest exceptions become the rule.

Besides, when the bill of lading was delivered by the carrier to the shipper in this case, reduced to writing, so far as the contract of carriage and the amount of freight to be charged was concerned, this was fixed, and not subject to be varied or contradicted by oral testimony as to what the understanding was prior to the execution of the contract of carriage, it

being a well-settled principle that the contract feature of a bill of lading is no more subject to change or modification by oral testimony than any other written contract; it is only to the receipt feature of the bill of lading that such oral testimony is admissible. It has been held in this State that it is the duty of the shipper to read his bill of lading, and unless it is by some device or artifice obliterated or rendered unintelligible, he is bound by its terms so far as the contractual feature is concerned. [The St. Louis, K. C. & N. Ry. Co. v. Cleary, 77 Mo. l. c. 637; O'Bryan v. Kinney, 74 Mo. 125; Wyrick v. M. K. & T. Ry. Co., 74 Mo. App. 406; Patterson v. Railway Co., 56 Mo. App. l. c. 662; Mires v. Railroad, 134 Mo. App. l. c. 386, 114 S. W. 1052; Wood v. Steamboat Fleetwood, 22 Mo. l. c. 562.]

The contention that the instrument set out in the statement in this opinion is not a bill of lading is untenable because it is an instrument issued by a carrier to a shipper in which the carrier receipts for the goods and agrees to haul them for a certain price, and it makes no difference so far as that is concerned whether the form was furnished by the shipper or the carrier; it meets all the requirements of a bill of lading, and in fact it was the only paper issued by the carrier to show the obligation in this transaction.

I do not believe it is necessary to decide whose duty it was to see that the proper notations appeared on the bill of lading and the waybill. When the bill of lading was issued and accepted without them, the amount the shipper had to pay became fixed under the rules and regulations of the Interstate Commerce Commission; that amount was due and owing and must have been paid regardless of the good faith of the transaction. The shipper and carrier then had their contractual relations fixed, which, under the law governing this case, they could not change by agreement

at that time, nor could they subsequently agree upon a different amount.

There is no doubt that in many cases the Interstate Commerce Law works injustice, but Congress by the Constitution is given power to pass laws for the general welfare of the country, and in its wisdom it has seen fit to enact this law; it is to the general welfare and not to the particular welfare of individuals that courts must look and see that the law is strictly enforced, and especially is this true where by an act of omission or commission parties have transgressed the law. In this particular case I feel certain that it works a hardship on the respondent, but to allow the respondent to escape the payment the law has fixed would be against the general welfare and render ineffectual a measure designed for its benefit. Fortunately, where such particular cases work hardships on the individual, there is an arbiter to which he may go for redress; and from the very nature of the law and the exigencies of the case and for the keeping of rates fixed and certain, that arbiter must necessarily be the Interstate Commerce Commission; that is his way, and it is the only way open for redress; he may there have his day in court, press the merits of his demand and thus not be denied a hearing, and an adjudication of his rights.

It is my opinion that the trial court erred in directing a verdict for the respondent and that the judgment should be reversed and the cause remanded for a trial in conformity with the views herein expressed. I therefore dissent from the result reached by a majority of the court.

STURGIS, J. (concurring).—I desire to say that I fully concur with FARRINGTON, J., in all he says in reference to the binding effect of the tariff rate filed by carriers with the Interstate Commerce Commission and that this effect is not dependent on the posting of

the copies by the local agents. As said by Commissioner HARLAN in Poor Grain Co. v. Railroad, 12 Int. Com. Rep. 418, this published rate "is as fixed and unalterable either by the shipper or by the carrier as if that particular rate had been established by a special act of the Congress." The published rate is in itself a contract with all the world at the specified rate and cannot be changed or modified by the carrier or shipper or both combined. The Interstate Commerce Act deprives carriers and shippers of the power to make individual contracts by substituting one uniform contract filed with the commission. All that any agent of a carrier can do is to give information as to what that contract is and the posting of copies of the tariff rates in railroad offices is for no other purpose, and is not a condition precedent to putting the rates in effect.

The act of Congress in question provides . that, "when any such common carrier shall have established and published its rates, fares, and charges in compliance with the provisions of this section, it shall be unlawful for such common carrier to charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any services in connectin therewith, than is specified in such published schedule of rates, fares, and charges as may at the time be in force." The act further provides that it shall be "unlawful for any person, persons, or corporation to offer, grant, or give, or to solicit, accept, or re-ceive, any rebate, concession, or discrimination in respect to the transportation of any property in inter-state or foreign commerce by any common carrier sub-ject to said act." This means that common carriers shall not give or grant to any shipper any rate other than the established published rate. They shall not do so for any purpose or in any manner. They shall not do so directly or indirectly. They shall not do so by contract, compromise or settlement. They shall

not do so by payment under a mistake of law or fact. They shall not do so by means of any "rebate, concession or discrimination." [C. & A. Railroad v. Kirby (1912), 32 Sup. Ct. Rep. 648.]

I concur also with FARRINGTON, J., in holding that, as the last and all the decisions of our Supreme Court, on the question of the binding and overruling effect of the decisions of the United States Supreme Court on the decisions of all State courts in matters pertaining to interstate commerce and the like, is to the effect that the federal Supreme Court is the final arbiter to which all State courts must yield, then we are not to follow the decision of the Supreme Court of this State when overruled or plainly in conflict with the decisions of the United States Supreme Court. We have a right to presume, and our Supreme Court has in effect told this court to presume, that it will, at the first opportunity, make its decisions conform to the decision of the federal courts in such matters.

I am convinced however that the plaintiff railroad did in the first instance exact and collect more than the established rate fixed by the tariff schedule filed with the Interstate Commerce Commission, a thing it had no right to do under the law as we all agree; and, therefore, it would have been compelled to pay back such excess charges in an action at law.

It is conceded that under the facts as proven the defendant has paid, after deducting this refund, the full rate of "27½ cts. per hundred pounds" fixed and designated in "Texas Tariff No. 42-B," which was the tariff on file with the Commerce Commission and in force covering the shipment of this stone from Carthage, Mo. to Ft. Worth, Texas. The only claim is that the cars in which the stone was actually shipped were not loaded to their minimum capacity and under item 81 of said Texas Tariff No. 42-B the railroad must charge and collect for the minimum capacity of

the car used, whether loaded to such capacity or not; and so plaintiff is now seeking to recover from defendant an amount in excess of the regular rate of 27½ cents per hundred pounds on the freight actually shipped. It will be noted that this item 81 provides that cars of a larger minimum capacity may be furnished to and used by the shipper without subjecting him to payment for excess weight up to the minimum capacity, provided such shipper has ordered a car of less minimum capacity and the carrier for its own convenience furnished a car of larger minimum capacity than is ordered. In the instant case the jury found, and that is binding on this court, that the shipper did order a car of less minimum capacity and brought himself within the rule; and that it is solely the fault of the carrier that the smaller minimum capacity car was not furnished and used.

But plaintiff further claims that, notwithstanding it was its fault in not furnishing the smaller car ordered, yet the shipper cannot rely on this fact as constituting an exception to the rule exempting him from payment of freight based on the minimum capacity of the car used, unless the capacity of the car ordered is noted on the bill of lading and carrier's waybill.

The very nature and definition of a bill of lading requires that it be issued by the carrier and it is not necessarily or generally signed by the consignor, and may or may not contain contractual provisions. [6 Cyc. 416 & 417.] Section 20 of the Interstate Commerce Act expressly requires common carriers receiving property for transportation to "issue a receipt or bill of lading therefor;" and penalties are provided for issuing false bills of lading. Under the power given it the Interstate Commerce Commission has provided for the use of uniform bills of lading by all railroads doing an interstate business. Of course it makes no difference whether the carrier or shipper

performs the clerical work of filling out the blank forms. It is the carrier's bill of lading.

With reference to the "Carrier's Waybill," on which the notation is also required to be made, the shipper does not so much as even see that. And it may be here remarked that the plaintiff did not even attempt to prove that the waybill here used did not contain the proper notation.

The writer fully agrees with FARRINGTON, J., that equality and uniformity of freight rates is the polar star of construction of the Interstate Commerce Act and all rules and regulations thereunder. But to hold that a shipper, who had ordered a car of a certain minimum capacity and loads the car furnished him on that order and pays the full established tariff rate on the commodity loaded and shipped by him in such car, must pay a higher rate because the carrier fails to furnish the size car ordered and then further fails to note on the bill of lading or waybill it's reason for furnishing a larger car, does not tend to promote uniformity and equality of freight rates. A more just and effectual remedy will be found in the penalty provisions for issuing false bills of lading; not meaning, however, to imply by this that this is a proper case for invoking such remedy.

The provision of the tariff schedule in question, permitting plaintiff to substitute larger cars than those ordered, is plainly for its benefit and so this item No. 81 says. Seeing that the shipper must under all circumstances pay freight on every pound that he puts in the car, it is not apparent how he would ever profit by having a larger car than he orders or in having the bill of lading and waybill, even if he could control these instruments, omit the notation claimed to be necessary to entitle him to a charge based on less than the minimum capacity of the car used. It is in this particular instance, and would be generally, to the advantage of the carrier, if it is allowed to recover.

This line of reasoning finds support in the ruling of the Interstate Commerce Commission in So. Cotton Oil Co. v. L. & N. R. R. Co., 18 Interstate Com. Rep. 180; So. Cotton Oil Co. v. S.o. Ry. Co., 19 Interstate Com. Rep. 79; Miller & Lux v. So. Pac. Co., 20 Interstate Com. Rep. 129.

To allow plaintiff to prevail in its contention here is to allow it to take advantage of and reap a benefit from its own wrong; and this is never allowed where there is no overshadowing reason for doing so.

It would seem that the provision for requiring the notation to be made by the carrier on the bill of lading and waybill is like the provision for posting the tariff schedules in the carrier's local offices in that it is directory rather than a condition precedent, and is to be done to afford a ready means of checking up the transactions of such carriers.

Should the Interstate Commerce Commission find it necessary or desirable to require all orders for cars to be in writing so as to avoid misunderstanding as to the kind of cars ordered it has power to do so but has not done so in the tariff schedule herein mentioned.

The writer therefore dissents from that portion of the opinion of FARRINGTON, J., dealing with this question and thinks the judgment should be affirmed.